## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| **UNITED STATES OF AMERICA** <br><br> **<u>ex</u> <u>rel</u>. ANNE M. FAGO** <br><br> **Relator,** <br><br> **BRINGING THIS ACTION ON BEHALF OF THE UNITED STATES OF AMERICA,** <br><br> **Plaintiffs,** <br><br> **v.** <br><br> **M & T MORTGAGE CORPORATION,** <br><br> **Defendant.** |

**Civil Action 03-1406  (GK/JMF)**

## MEMORANDUM OPINION

This case was referred to me for resolution of discovery disputes.  Currently pending before me for resolution is <u>Plaintiff's Motion to Compel</u>.  For the reasons stated herein, plaintiff's motion will be granted in part and denied in part.

## I.    BACKGROUND

Relator Anne Fago ("plaintiff") brought this *qui tam* action on behalf of the United States against her former employer M&T Mortgage Corporation ("M&T") alleging that M&T violated the False Claims Act, 31 U.S.C. § 3729 *et seq*.[1] <u>Amended Complaint</u> ("Am. Compl.") at 2-4. M&T is a "Direct Endorser" of mortgages insured by the Department of Housing and Urban

---

[1] All citations to the United States Code are to the electronic version available on Westlaw and Lexis.

Development ("HUD"). <u>Plaintiff's Memorandum in Support of Motion to Compel</u> ("Pls. Mem.") at 7. These government-insured mortgages are typically made to low income, first time home buyers and buyers with spotty credit histories. Am. Compl. at 5. When these government-insured loans go into default, M&T presents a claim for payment of the loan to HUD, HUD pays M&T, and then HUD becomes the owner of the property. <u>Id.</u> at 6. Plaintiff brought this lawsuit alleging that M&T submitted applications to HUD for loan guaranties that contained forgeries, thereby fraudulently causing HUD to guarantee and subsequently pay claims for loans that it otherwise would not have insured. <u>Id.</u> at 3.

Plaintiff began working for M&T in July 2001 in its Buffalo, New York, Post-Closing Department. <u>Id.</u> at 4. After a new loan application was closed, the loan paperwork was sent to the Buffalo Post-Closing Department where it was audited for accuracy. <u>Id.</u> at 5. If the loan was made to a high-risk customer, a copy of the loan papers were assembled and placed into a "HUD Case Binder." <u>Id.</u> These HUD Case Binders were then audited for accuracy. <u>Id.</u> A common problem with these case binders was missing, incomplete, or unsigned documents. <u>Id.</u> at 5-6. Plaintiff's supervisor was Camille Bettcker and her trainer was Suzanne Palmer. <u>Id.</u> at 4. According to plaintiff, Bettcker and Palmer regularly forged such missing and unsigned documents and instructed plaintiff to do the same. <u>Id.</u> at 7-8.

When M&T received the complaint in this lawsuit, its counsel, Kip Schwartz, initiated an investigation into plaintiff's allegations. <u>Defendant's Memorandum in Opposition to Plaintiff's Motion to Compel</u> ("Defs. Opp'n") at 4. On June 10, 2004, M&T met with HUD to discuss plaintiff's allegations and M&T's resulting investigation. Pls. Mem. at 8. M&T also went through the process of trying to ascertain which loans could possibly fall within the universe of potentially

actionable loans. Id. at 18.  As a result of this review, M&T determined that there were eighty-six such potentially actionable loans. Id.  Specifically, there were eighty-six loans that had been processed through M&T's Buffalo Post-Closing Department for which a subsequent claim was submitted to HUD. Id.  M&T later found twenty-two additional potentially actionable loans, raising the number to 108. Id.

Plaintiff filed this motion to compel primarily for the purpose of obtaining information relating to M&T's investigation and its determination of the universe of potentially actionable loans.  Specifically, plaintiff moved the Court to order M&T to do the following: (1) comply with Judge Kessler's June 10, 2005 order by answering Interrogatory Nos. 21 through 25; (2) produce documents relating to M&T's June 10, 2004 presentation to HUD; (3) provide complete answers to interrogatories and document requests relating to the identification of potentially actionable loans, who audited those loans, and monies received by HUD from the sale of the properties; and (4) produce a knowledgeable Rule 30(b)(6) corporate deponent. Plaintiff's Motion to Compel at 1-2.

## II.    DISCUSSION

### A.    Additional Interrogatories

Plaintiff propounded twenty-five interrogatories, the last five of which M&T refused to answer on the ground that plaintiff had exhausted her presumptive twenty-five interrogatory limit under the Local and Federal Rules of Civil Procedure.  On June 10, 2005, Judge Kessler resolved that dispute by allowing plaintiff five additional interrogatories. Pls. Mem., Exh. C.  Immediately after Judge Kessler's order, plaintiff sent a letter to M&T stating that she deemed Interrogatory Nos. 21 through 25 served as of the date of that order. Pls. Mem. at 5-6.  M&T has, however,

3

refused to answer these final five interrogatories.  Plaintiff now moves the Court to compel M&T to answer Interrogatory Nos. 21 through 25.

In opposition, M&T argues that, because Rule 33(a) of the Federal Rules of Civil Procedure provides for the inclusion of subparts in calculating the number of interrogatories propounded, Interrogatory Nos. 21 through 25 are actually interrogatories 32 through 36 and, therefore, plaintiff is currently seeking answers to interrogatories in excess of the thirty she was allowed (*i.e.*, twenty-five under the rules plus the additional five allowed by Judge Kessler's order). Defs. Opp'n at 3.

In initially responding to plaintiff's interrogatories, M&T only objected to the last five, Interrogatory Nos. 21 through 25, as being beyond plaintiff's presumptive limit. Pls. Mem. at 4. Indeed, it appears that M&T answered the first twenty without objecting to any of them on that ground.  Accordingly, the only interrogatories that were at issue before Judge Kessler were Interrogatory Nos. 21 through 25 and she resolved that dispute by simply allowing plaintiff five additional interrogatories.  Under the logic of M&T's present argument, M&T should have objected to more than just the final five interrogatories.  Specifically, it should have objected to the interrogatories that, based on subparts, constituted interrogatories 26 through 31.  Instead, M&T answered those interrogatories without so objecting and waited until opposing plaintiff's present motion to raise the argument.  Moreover, M&T's argument would render Judge Kessler's order meaningless.  It is fair to say that, at this point, the objection has been waived.  Accordingly, M&T shall answer Interrogatory Nos. 21 through 25.

**B.    Information and Documents Relating to Defendant's Presentation to HUD**

On June 10, 2004, M&T met with HUD and made a presentation regarding its

4

investigation into plaintiff's allegations.  Previously, plaintiff sought the production of a

PowerPoint presentation that was used in that meeting.  On April 15, 2005, Judge Kessler ruled,

by minute order, that, even though the PowerPoint presentation constituted attorney work-product,

M&T had waived work product protection by presenting it to HUD and, therefore, ordered it

produced. Pls. Mem., Exh. C.  Plaintiff now moves the Court to compel the production of

documents and deposition testimony relating to M&T's investigation and underlying the

PowerPoint presentation that M&T has withheld under claims of work product protection.

Plaintiff argues that the work product doctrine does not shield this discovery for two reasons: (1)

the investigation was not work product; and (2) that, even if it was work product, M&T waived

protection by presenting the results of the investigation to HUD at the June 10, 2004 meeting.

Specifically, plaintiff seeks a complete response to each of the following document requests:

> **DOCMENT REQUEST NO. 38:** All documents referenced, mentioned, discussed or otherwise identified in the document entitled "M&T Mortgage Corporation Meeting with HUD," M&T 010853-010867 (the "HUD Presentation").

> **DOCUMENT REQUEST NO. 40:** All documents related to or constituting the witness interviews quoted, discussed, identified or disclosed in the HUD Presentation, including without limitation the three interviews described or quoted at p. 7 of the document.

> **DOCUMENT REQUEST NO. 41:** All documents concerning, evidencing or relating to the June 10, 2004 meeting with HUD, including without limitation, any notes taken at the meeting.

> **DOCUMENT REQUEST NO. 42:** All documents concerning and evidencing or relating to M&T's representation that it "reiterated M&T policy, prohibiting such activities to all originations and post-closing staff" as stated in the HUD Presentation, including any documents that constitute or describe such "M&T policy[.]"

> **DOCUMENT REQUEST NO. 43:** All documents concerning,

5

evidencing or relating to the investigation (including any findings and/or conclusions) conducted by Buchanan Ingersoll as referenced on page 5 of the HUD Presentation.

**DOCUMENT REQUEST NO. 45:** All documents that support or are related to your statement that "interview results universally confirm the non-critical nature of documents in question" as stated on page 10 of the HUD Presentation.

**DOCUMENT REQUEST NO. 48:** All documents identifying the three employees/ex-employees described on p. 7 of the HUD Presentation.

**DOCUMENT REQUEST NO. 50:** All documents related to or constituting the "reviews completed to date" or the ["i]nternal file review" described on p. 8 of the HUD Presentation.

**DOCUMENT REQUEST NO. 51:** All "audit results for other areas" as described at p. 11 of the HUD Presentation.

Pls. Mem. at 9-11.  In addition, plaintiff seeks deposition testimony regarding "the identity of the

M&T employees who admitted to forging documents," as referenced in the PowerPoint

presentation. Id. at 9.

       *1.     Is the Sought After Information Work Product?*

      The work product doctrine is designed to balance the need of the adversary system to

promote an attorney's preparation against society's general interest in revealing all facts relevant

to the resolution of a dispute. In re Sealed Case, 856 F.2d 268, 273 (D.C. Cir. 1988) (citing In re

Subpoenas Duces Tecum, 738 F.2d 1367, 1371 (D.C. Cir. 1984)).  A lawyers's work product is

reflected in "interviews, statements, memoranda, correspondence, briefs, mental impressions,

personal briefs, and countless other tangible and intangible ways." Hickman v. Taylor, 329 U.S.

495, 511 (1947).  "Were such materials open to opposing counsel on mere demand, much of what

is now put down in writing would remain unwritten [and] [a]n attorney's thoughts, heretofore

inviolate, would not be his own." Id.  In furtherance of this principle, Rule 26 of the Federal Rules of Civil Procedure protects from disclosure materials prepared by or for a party, its attorney, or its representative in anticipation of litigation and allows for discovery only upon a showing of substantial need and an inability to obtain the substantial equivalent without undue hardship. Fed. R. Civ. P. 26(b)(3).

In order for documents to be protected by the work product doctrine, the proponent must show that the documents were prepared or obtained *in anticipation of litigation*. Id.  "'In anticipation of litigation' contains two related, but nevertheless distinct, concepts.  One is temporal.  The other is motivational." Jinks-Ulmstead v. England, 231 F.R.D. 13, 15 (D.D.C. 2005) (quoting Edna Selan Epstein, The Attorney-Client Privilege and the Work Product Doctrine, at 314 (4th ed. 2001)).  First, there must have been at least "a subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable." EEOC v. Lutheran Social Services, 186 F.3d 959, 968 (D.C. Cir. 1999) (citing In re Sealed Case, 146 F.3d 881, 884 (D.C. Cir. 1998)).  Second, the document must have been "prepared or obtained because of the prospect of litigation." Lutheran Social Services, 186 F.3d at 968 (quoting Senate of Puerto Rico v. United State Dep't of Justice, 823 F.2d 574, 586 n.42 (D.C. Cir. 1987)).[2]  The operative question is whether the "documents 'would have been created in essentially similar form irrespective of the litigation.'" Willingham v. Ashcroft, 228 F.R.D. 1, 4 (D.D.C. 2005) (citing United States v. Adlman, 134 F.3d 1194, 1202-03 (2d Cir. 1998)).

_____

[2] In moving to compel, plaintiff misstates the "in anticipation of litigation" test as requiring a document to have been "prepared principally or exclusively to assist in anticipated or ongoing litigation." Pls. Mem. at 12.  That is not the standard applied by this circuit.  Rather, as stated above, the test is whether the document was "prepared or obtained *because of* the prospect of litigation." Lutheran Social Services, 186 F.3d at 968 (emphasis added).

In the present case, the parties take extreme positions. Plaintiff argues that the investigation was not work product because it was conducted for the business purpose of explaining the situation to HUD. Pls. Mem. at 7-8. On the other hand, M&T argues that any non-litigation purpose coincidently served by its investigation was purely collateral to the principal purpose of defending plaintiff's lawsuit. Defs. Opp'n at 4-5. In reality, it appears that M&T's investigation had dual purposes: one to gather information in preparation of this litigation, the other to reassure HUD and preserve its standing as a direct endorser of government-insured mortgages. Accordingly, the issue in this case is whether the documents surrounding M&T's investigation and referenced in its presentation to HUD were prepared or obtained "because of" the litigation and would not have been created in an essentially similar form without the litigation. As I indicate below, I will defer ruling on this issue until after I have reviewed the documents *in camera*.

### 2.    Did M&T Waive Work Product Protection?

In the alternative, plaintiff argues that, even if the investigation and related documents are work product, that protection was waived when M&T disclosed its findings and conclusions to HUD. Pls. Mem. at 13. Plaintiff bases her argument on the purported rule that "once a corporate defendant makes the strategic choice to disclose the fruits of an 'internal' investigation to its regulator, it cannot keep the details of that investigation (or the underlying interviews and documents) under wraps in civil litigation." Id. at 7. In opposition, M&T argues that its limited disclosure to HUD did not constitute such a subject matter waiver because HUD was not M&T's adversary, M&T merely represented to HUD that it was providing the findings of an ongoing investigation, the disclosure was made pursuant to a Federal Housing Administration regulation,

and M&T does not, as plaintiff contends, intend to use HUD's failure to take administrative action to support its defense of this lawsuit. Defs. Opp'n at 6-8.

The disclosure of a document protected by the work product doctrine typically waives work product protection for that document. See In re United Mine Workers of Am. Employee Benefit Plans Litig., 159 F.R.D. 307, 310 (D.D.C. 1994) (citing Wichita Land & Cattle Co. v. Am. Fed. Bank, 148 F.R.D. 456, 460-61 (D.D.C. 1992)).  In certain circumstances, the disclosure waives protection for not only the document actually disclosed, but also for documents relating to the same subject matter. See Bowles v. Nat'l Ass'n of Home Builders, 224 F.R.D. 246, 259 (D.D.C. 2004).  In the attorney work product context, subject matter waiver is only applied when ordering additional disclosure would be consistent with the purpose of the work product doctrine, which is the promotion of the adversary system by safeguarding the fruits of an attorney's trial preparations from the opponent. United Mine Workers, 159 F.R.D. at 312 (court refused to find subject matter waiver where work product was not disclosed to gain a tactical litigation advantage and such broad disclosure would result in a strategic windfall for the opponent).  See also Bowles, 224 F.R.D. at 259 (where defendant only disclosed the work product documents that supported its argument and not the documents that did not support its argument, the court found that subject matter waiver would promote the adversary system by ensuring that the evidence in the record would not be one-sided).  In situations where the court finds that subject matter waiver is necessary to promote the adversary system, it is within the court's "discretion to define the subject matter of the disclosed documents narrowly to prevent the scope of the subject matter waiver from being unduly broad." United Mine Workers, 159 F.R.D. at 309.

Without reviewing the documents at issue in this case, I cannot determine which, if any, of

the documents should be produced as a result of M&T's disclosures in its presentation to HUD. In order to properly exercise my discretion, I need to review *in camera* the purportedly work product documents that are responsive to Document Request Nos. 38, 40-43, 45, 48, 50, and 51. Accordingly, I will order M&T to submit the documents for *in camera* review within ten days of this memorandum opinion.  In addition, M&T shall provide the Court with a log providing the bates number(s), date, author, and recipient of each document submitted.  I will also defer deciding whether M&T must provide deposition testimony regarding "the identity of the M&T employees who admitted to forging documents" until after I have reviewed the documents.

###    C.    Interrogatories and Document Requests Relating to Who Possibly Committed Forgeries and Which Loans Possibly Contain Forgeries

Plaintiff asserts that M&T has inadequately responded to four interrogatories and two document requests that purportedly seek information relating to how M&T identified the universe of potentially actionable loans, who committed the alleged forgeries, and M&T's defense that HUD's losses must be reduced by any monies recouped through the sale of the foreclosed properties.

###    1.    *Interrogatory No. 15*

Interrogatory No. 15 requests that M&T "identify which individual in [M&T's] Post-Closing Department reviewed each of the 86 loans."[3] Pls. Mem. at 18.  M&T objects to this interrogatory on the ground that, under Rule 33(d) of the Federal Rules of Civil Procedure, it is not obligated to identify which employee reviewed each loan because it has produced documents from which plaintiff can ascertain who audited each of the 108 loans. Defs. Opp'n at 10.

_____

[3] The interrogatories were propounded before M&T had identified the additional twenty-two potentially actionable loans, making the total number 108.

Specifically, M&T produced the HUD Case Binders for each of the loans, which contain a checklist setting forth the initials of the employees in the Post-Closing Department who audited the loan, as well as M&T's organizational charts, which provide the names and positions of M&T's current and former Post-Closing Department employees. Id.  According to M&T, the loan binders can be cross-referenced with the organizational charts to determine who audited each loan. Id.  Moreover, the HUD Case Binders commonly contain correspondence from the employee who was responsible for auditing the file. Id.

Under Rule 33(d), "where the answer to any interrogatory may be derived or ascertained from the business records of the party upon whom the interrogatory has been served . . . and the burden of deriving the information is substantially the same for the party serving the interrogatory as for the party served, it is sufficient to answer such interrogatory to specify records from which the answer may be derived or ascertained . . . ." Fed. R. Civ. P. 33(d).  Plaintiff argues that Rule 33 does not apply because M&T's burden in answering Interrogatory No. 15 would not be "substantially the same" as the burden on plaintiff. Plaintiff's Reply Memorandum In Support of Her Motion to Compel ("Pls. Reply") at 10.  Relying on the deposition testimony of two M&T employees, Kelley Attig, M&T's Vice President for Residential Mortgage Servicing, and Debbie Boutillier, plaintiff asserts that M&T could easily figure out who audited each loan from M&T's custom-designed software, called Fitech, FiServ, and Fidelity. Id.  Plaintiff explains that, through its software, M&T can view various "screens" that provide information about each loan, including the identity of who audited a particular loan. Pls. Mem. at 21.  In contrast, to ascertain the same information, plaintiff would have to guess the meaning of the handwritten initials in the checklists and possibly have to take additional depositions. Pls. Reply at 10.

11

However, it is not clear whether M&T can in fact readily ascertain who reviewed the 108 loans by using its software. At her deposition, Attig explained that most of the loans at issue in this lawsuit are no longer "active in [M&T's] system" and have been "archived." Pls. Mem., Exh. F at 10. Because they have been archived, M&T can no longer learn about the loans by simply using its software to view the "screens" as plaintiff contends. Id. To illustrate, in culling through the loans to determine which ones are potentially actionable in this lawsuit, M&T had to rely on its programmers to create codes to "pull the data that would exist if those screens [-] if those loans [-] were active today." Id. In other words, the electronic data appears to exist, it is just a matter of accessing it.

Logically, it would seems that, if M&T was able to pull the information needed to determine whether a given loan was potentially actionable in this lawsuit, it would also be able to pull the name of the employee who audited the loan. A definitive answer from M&T as to who audited each loan would be of significantly greater value to plaintiff than her own inconclusive guess as to the meaning of handwritten initials. Accordingly, I will order M&T to submit a brief, within ten business days of this memorandum opinion showing cause why, if it so contends, it is not capable of pulling the names of the persons who audited each of the 108 loans from its electronic archives and, if it is capable of so doing, why, if it so contends, the burden of pulling the information would be prohibitive. Plaintiff will have ten business days thereafter to respond.

> 2.    *Document Request No. 36*

Plaintiff also moved the Court to compel M&T to "produce all documents that it relied on in culling out the 108 loans which M&T contends are actionable," including "the 35 [Fitech and FiServ] screen prints for all loans which [it] excluded from its 'universe of loans.'" Pls. Mem. at

12

21-22 (emphasis in original).  M&T objects to plaintiff's assertion that she is entitled to this

additional information on two grounds.  First, plaintiff has never propounded an interrogatory

seeking this information. Defs. Opp'n at 11.  Second, the Fitech and Fiserv screens that plaintiff

seeks ceased to exist prior to the initiation of this lawsuit. Id. at 15.

Plaintiff bases her entitlement to these "screen" printouts on a combination of

Interrogatory No. 15 and Document Request No. 36.  In Document Request No. 36, plaintiff

requested "[a]ll documents reviewed or relied upon to answer Plaintiffs First and Second Set of

Interrogatories." Pls. Mem. at 20.  Plaintiff argues that, because Interrogatory No. 15 asks M&T to

identify who reviewed each of the eighty-six (now 108) loans, M&T must produce "all documents

that it relied on in culling out the 108 loans." Id. at 21-22.  Plaintiff asserts that, to cull out the 108

loans, M&T reviewed the Fitech and FiServ "screens" discussed above. Id. at 21.

The problem with plaintiff's argument is that the documents she wants compelled are not

responsive to Document Request No. 36.  Plaintiff wrongfully assumes that answering

Interrogatory No. 15 required M&T's determination of the universe of potentially actionable

loans.  Interrogatory No. 15 simply asks M&T to "identify which individual in [M&T's] Post-

Closing Department reviewed each of *the 86 loans*." Id. at 18 (emphasis added).  The

interrogatory was expressly limited to the eighty-six loans.  At the time the interrogatory was

served, the universe of potentially actionable loans, which then totaled eighty-six, had already

been determined.  Accordingly, to answer Interrogatory No. 15, M&T would not have had to

review any loans other than the eighty-six at issue.[4]  Therefore, because Document Request No.

---

[4] Arguably, M&T would be required under Rule 26(e) to supplement its answer with the information relating to the twenty-two additional potentially actionable loans.

36 asks for only documents reviewed or relied on in answering plaintiff's interrogatories, and because, to answer Interrogatory No. 15, M&T did not have to review the documents plaintiff seeks, those documents are not responsive to Document Request No. 36 and I will not compel M&T to produce them.

        *3.    Interrogatory No. 16*

    In Interrogatory No. 16, plaintiff asks defendant to identify, for each of the eighty-six loans, the amount of "any reimbursement or return received by HUD." Pls. Mem. at 18. Pursuant to this interrogatory, plaintiff wants the Court to either compel M&T to provide information relating to HUD's sale of properties after its payment of insurance claims or, if M&T does not have such information, to state so under oath and in writing. Id. at 22. According to plaintiff, this information in necessary for her to "flesh out" M&T's argument "that HUD's loss must be offset by any monies recouped through HUD's sale of the property after paying the insurance claims." Id. In opposition, M&T states that it has attempted to obtain this information, but that it has not been able to do so because, as M&T's employee Morrison Smith explained at his deposition, HUD will not share this information with loan providers. Defs. Opp'n at 11, Exh. C.

    I cannot compel M&T to provide information that it does not have. It is HUD that sold the properties, and it is HUD that received the monies from the sale. Unless HUD provided that information to M&T, M&T would not have it. And, as Morrison explained at his deposition, HUD has chosen not to share information about what monies it received through the sale of the properties with M&T or other direct endorsers. However, it would not be unreasonable to require M&T to state in its answer to Interrogatory No. 16 that HUD does not provide it with information regarding the sale of properties. M&T shall supplement its answer accordingly.

4.        *Interrogatory No. 17*

In Interrogatory No. 17, plaintiff requests that M&T identify all conversations, meetings, or other contacts between M&T and HUD concerning allegations of M&T's fraud and forgery. Pls. Mem. at 19.  Plaintiff asserts that M&T has not provided any information in response to this interrogatory and asks the Court to compel M&T to provide a complete answer.  In opposition, M&T contends that it has in fact provided plaintiff with the information sought in Interrogatory No. 17.  Specifically, it has produced three letters and the PowerPoint presentation to HUD, which provide all contact between itself and HUD relating to the allegations in this litigation. Defs. Opp'n at 12.  In addition, M&T asserts that the participants of the only face-to-face meeting with HUD (*i.e.*, the June 10, 2004 presentation) have been identified in deposition testimony. Id. at 12-13.

Plaintiff is entitled to a complete answer to Interrogatory No. 17 and defendant has not provided sufficient grounds as to why it should be relieved of that responsibility.  A clear, concise statement in an interrogatory answer that spells out the number and substance of any communications between M&T and HUD about the allegations in this lawsuit has unique value. Even though three of the four communications are spelled out in letters, a complete answer to Interrogatory No. 17 would explain that these letters were the *only* communications between M&T and HUD other than the June 10, 2004 meeting.  Moreover, given the small number of communications at issue, it certainly would not be burdensome for M&T to provide the requested information.  With regard to the one face-to-face meeting with HUD, plaintiff is entitled to more than just the PowerPoint presentation, which is, by its very nature, summary.  Accordingly, I will order M&T to provide a complete answer to Interrogatory No. 17.

15

5.    *Interrogatory No. 18*

In Interrogatory No. 18, plaintiff requests that M&T "[i]dentify every loan originated by M&T that (a) went through the Post-Closing Department and (b) the note, servicing or any other interest in the loan [that] was sold to another entity." Pls. Mem. at 19.  According to plaintiff, although not clear from its phrasing, this interrogatory "seeks the identity of all of the loans that went through the offending Post-Closing Department and were then sold by M&T to another entity." Id. at 23.  For each such loan, plaintiff wants M&T to provide the M&T loan number, the borrower's name, address, and social security number, the Federal Housing Administration Case Number, and the dollar amount of the loan.[5] Id. at 24.

In opposition, M&T argues that (1) it has fulfilled its obligations in responding to Interrogatory No. 18 by providing plaintiff with the M&T loan number for the 696 loans processed through its Post-Closing Department that were subsequently sold and providing the Federal Housing Administration case detail summaries for the nine loans that M&T determined fall within the universe of potentially actionable loans, (2) it cannot easily access the identifying information plaintiff seeks, and (3) the additional identifying information is not necessary for HUD to locate the loan binders. Defs. Opp'n at 13-14.

Plaintiff asserts that she needs this identifying information for *all* loans that went through M&T's Post-Closing Department and were subsequently sold, as opposed to only the nine such loans that M&T identified as potentially actionable, because, under the False Claims Act, M&T may be liable for not only false claims it presented to the government, but also false claims that it

---

[5] In the definition section of her interrogatories, plaintiff defines "identify" when referring to a loans as "the borrower's name, address and social security number, the loan number, the FHA loan number and the amount of the loan." Pls. Reply, Exh. A.

*caused to be presented* to the government. Pls. Mem. at 23.  In other words, if M&T forged

signatures on a loan document and then sold the loan to another lender who filed an insurance

claim with the government, then M&T may be liable under the False Claims Act. Id.  Moreover,

because plaintiff needs to obtain the loan files from HUD or from the loan purchasers, M&T's

*internal* loan numbers are useless. Id. at 24.

Some additional background is necessary to fully understand this dispute.  M&T initially

objected to Interrogatory No. 18 on the ground that it was overly broad and unduly burdensome.

Id. at 23-24.  However, M&T eventually provided plaintiff with a list of 696 M&T loan numbers

on August 5, 2005, which, according to plaintiff, was useless and "arbitrarily excluded all loans

sold to Chase Manhattan Mortgage (the largest purchaser of M&T loans) . . . ." Id. at 23.

According to Attig's deposition testimony, M&T did not include the loans that were sold to

Chase Manhattan Mortgage because, pursuant to a special relationship that M&T has with Chase

Manhattan Mortgage, it can access the necessary information about those loans. See Defs. Opp'n

at 13-14, Exh. H.  Therefore, the Chase Manhattan Mortgage loans were included in the original

universe of loans from which the 108 potentially actionable loans were culled. Id.  Of the

approximately 528 loans sold to Chase Manhattan Mortgage, M&T has provided plaintiff with

identifying information for forty-six of them.[6] Pls. Reply at 12.  In contrast, M&T does not keep

track of loans after they are sold to lenders other than Chase Manhattan Mortgage. See Defs.

Opp'n at 13-14, Exh. H.  According to M&T, it has since gone back and identified the potentially

actionable loans that were sold to lenders other than Chase Manhattan Mortgage. Defs. Opp'n at

---

[6] The parties have not explained why information on these forty-six Chase Manhattan Mortgage loans was provided to plaintiff.  I would assume that they were among the 108 potentially actionable loans, but the parties have not actually said so.

14. These are the nine loans for which M&T has produced the Federal Housing Administration case detail summaries in response to Interrogatory No. 18. Id.

Rule 26(b)(1) entitles parties to broad discovery, permitting discovery that is "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). Accordingly, "the party opposing discovery must make a specific showing, supported by declaration, as to why the production sought would be unreasonably burdensome." Pleasants v. Allbaugh, 208 F.R.D. 7, 12 (D.D.C. 2002) (citing Pro-Football, Inc. v. Harjo, 191 F. Supp. 2d 77, 80 (D.D.C. 2002)). Plaintiff should not have to rely on M&T's assertion that it has identified the "universe of potentially actionable loans." Plaintiff has the right to make that determination for herself. To make that determination, plaintiff needs identifying information for more than just the nine loans identified by M&T as potentially actionable so that she can obtain the necessary loan information from HUD or the subsequent purchasers. On the other hand, M&T has not presented sufficient evidence to convince me that it would be unduly burdensome to produce the requested identifying information. M&T contends that, to access the information, one of its employees would have to "sit at a computer and bring up each loan individually and then do a search of that file for the requested information." Defs. Opp'n at 14. That statement, without any supporting documentation, is the extent of M&T's evidence. M&T made no effort to provide evidence regarding the time or expense of such an endeavor. Although gathering the requested information on a loan-by-loan basis would likely be time consuming, there is no information before me evidencing that this burden would be unlike the labor commonly required of civil litigants in discovery.

Moreover, although M&T asserted in a parenthetical that "[s]uch information is not

necessary for locating loan binders at HUD," M&T provided absolutely no explanation as to why

such information is not needed or what information HUD would in fact need.  Such a bald

assertion cannot justify denying plaintiff an answer.  For the forgoing reasons, I will order that

M&T fully respond to Interrogatory No. 18.

6.    <em>Document Request No. 37</em>

Document Request No. 37 is a catch-all request in which plaintiff requests, "[a]ny other

documents not requested above that relate to the subject matter of this litigation or that otherwise

support, evidence, refute or contradict any claims alleged in the Amended Complaint." Pls. Mem.

at 20.  Based on this catch-all request, plaintiff seeks an order compelling M&T "to conduct a

good-faith search and review of Ms. Bettcker's and Ms. Palmer's e-mails and documents, and to

produce responsive documents." Id. at 25.  In opposition, M&T contends that it has produced all

responsive documents and that it "has not located any communications between Ms. Bettcker and

Ms. Palmer that relate to the subject matter of this litigation." Defs. Opp'n at 15-16.

As a preliminary matter, considering the potential importance of the correspondence

of Bettcker and Palmer, who plaintiff alleges were "the two ringleaders in the forgery

scheme," it would have been prudent for her to have propounded a separate document request

expressly requesting this correspondence.  Instead, plaintiff has now moved the Court to

compel the production of Bettcker's and Palmer's e-mails by way of a catch-all document

request.  Plaintiff asserts that this catch-all request obligated M&T to "conduct a good-faith

search and review of Ms. Bettcker's and Ms. Palmer's e-mails." Pls. Mem. at 25.  By

plaintiff's logic, Document Request No. 37 would also have obligated M&T to make a good-

faith search of <em>all</em> of its documents that could possibly relate to this lawsuit.  While it may be

19

prudent for M&T to conduct such a search as part of its defense of this lawsuit, Document Request No. 37 can only obligate M&T to disclose the responsive documents that it has in fact found. Any greater obligation would eviscerate the Rule 34 discovery process because a party could simply propound one catch-all document request and expect opposing counsel to do its work for it.

I note, however, that in opposing plaintiff's motion, defendant stated only that it "has not located any communications *between* Ms. Bettcker and Ms. Palmer that relate to the subject matter of this litigation." Defs. Opp'n at 15-16 (emphasis added). That statement is not entirely responsive to plaintiff's motion to compel, which seeks e-mails from or to either Bettcker or Palmer, as opposed to just e-mails *between* them. Accordingly, I will order M&T to produce any e-mails from or to either Bettcker or Palmer that it has located and that relate to the subject matter of this litigation, but I will not require M&T to do more.

### D.    Rule 30(b)(6) Deposition Testimony

Finally, plaintiff seeks an order compelling M&T to provide, under Rule 30(b)(6), additional corporate deposition testimony on four topics, either by educating the witness previously designated or by designating someone else to testify. Pls. Mem. at 28. Specifically, plaintiff seeks deposition testimony on the following topics: (1) "M&T's QC process as it relates to government-issued loans and the 108 loans"; (2) "[t]he 63 loans identified at p. 9 of the 6/10/04 HUD presentation, including FHA Case Number, M&T loan number, and other identifying information"; (3) "[t]he identification of all loans which (a) were processed by M&T's government Post-Closing Unit (1997-2004) and (b) subsequently all or any interest in the loan was sold to another entity"; and (4) "[t]he identity of the

employee who reviewed or handled each of the 108 Loans." Id. at 26.  M&T designated Attig to testify on these topics, but, according to plaintiff, Attig was not able to provide adequate testimony. Id. at 25.

Rule 30(6)(b) allows a party to depose a corporation through designated representatives of that corporation.  Specifically, Rule 30(b)(6) provides:

> A party may in the party's notice and in the subpoena name as the deponent a public or private corporation . . . and describe with reasonable particularity the matters on which examination is requested.  In that event, the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on their behalf, and may set forth, for each person designated, the matters on which that person will testify . . . .  The persons so designated shall testify as to matters known or reasonably available to the organization . . . .

Fed. R. Civ. P. 30(b)(6).  Because Rule 30(b)(6) allows a corporation to speak through its designated agents, the agents' testimony is generally admissible as a statement of the corporation. McKesson Corp. v. Islamic Republic of Iran, 185 F.R.D. 70, 79 (D.D.C. 1999); Rainey v. Am. Forest and Paper Ass'n, Inc., 26 F. Supp. 2d 82, 94 (D.D.C. 1998) (the witness is "speaking for the corporation").  One of the primary purposes of Rule 30(b)(6) is to "curb the 'bandying' by which officers or managing agents of a corporation are deposed in turn but each disclaims knowledge of the facts that are clearly known to the organization and thereby to it." Fed. R. Civ. P. 30(b)(6) advisory committee notes.  See also McKesson, 185 F.R.D. at 79; Alexander v. Fed. Bureau of Investigation, 186 F.R.D. 137, 141 (D.D.C. 1998).

Before the responding party can designate a witness, the requesting party must "describe with reasonable particularity the matters on which examination is requested."

21

Alexander, 186 F.R.D. at 139 (quoting Fed. R. Civ. P. 30(b)(6)).  Such description of the

deposition topics triggers several duties on the part of the responding entity.  First, the

responding entity must designate a deponent who is knowledgeable on the subject matter

identified as the area of inquiry. Id. at 141.  Second, the responding entity must designate more

than one deponent if multiple deponents are necessary to respond to all of the relevant areas of

inquiry. Id.  Third, the responding entity must prepare the deponent so that he or she can

testify on matters not only within his or her personal knowledge, but also on matters

reasonably known by the responding entity. Id.; McKesson, 185 F.R.D. at 79 ("A designee of

the receiving entity should not only testify about matters within his or her own personal

knowledge, but also about matters which the receiving entity has reasonable knowledge and

access."); In re Vitamins Antitrust Litig., 216 F.R.D. 168, 172 (D.D.C. 2003) (defendant

corporation was obligated to produce witnesses who "were thoroughly educated about the

noticed deposition topics with respect to any and all facts known to [it] or its counsel").

Fourth, if it becomes apparent during the deposition that the designated deponent is unable to

respond to the relevant areas of inquiry, then the responding entity has the duty to substitute

the designated deponent with a knowledgeable deponent. Alexander, 186 F.R.D. at 141;

McKesson, 185 F.R.D. at 79 ("If an entity's designated witness lacks sufficient knowledge or

fails to adequately respond to the deposition requirements, the responding entity must

designate additional witnesses capable of providing sufficient answers.").

### 1.    M&T's quality control process

In the Rule 30(b)(6) deposition notice, topic number eleven was stated as, "M&T's QC

process as it relates to government-issued loans and the 108 loans." Pls. Mem., Exh. I.

According to plaintiff, Attig was not knowledgeable about M&T's quality control process and that, rather than educate herself, she testified that another M&T employee, Boutillier, was the person with knowledge of M&T's quality control process. Pls. Mem. at 26.  In opposition, M&T argues that Attig did in fact testify about the quality control process, and that Attig only directed plaintiff to Boutiller when she was asked very specific questions. Defs. Opp'n at 16. Further, M&T argues that additional testimony on M&T's quality control process is unnecessary because that information has already been provided via Boutillier's deposition testimony and M&T's Quality Control Manual. Id.

I have reviewed the excerpts of Attig's deposition testimony provided with the parties' briefs and find that Attig was not adequately prepared to testify on M&T's quality control process.  The following exchange illustrates Attig's lack of preparedness:

> Q.      Okay.  And – and what sort of work does corporate
> quality control do with respect to the government post-closing
> unit during this time period, [1997] to 2004?
>
> A.      I don't know.  We would need to talk to them.
>
> Q.      Well, I thought you were the designee on this subject.
>
> ***
>
> Q.      Have you done any work to educate yourself about
> M&T's QC process as described here in topic 11?
>
> A.      I think most likely, the reason that it was assumed that I
> would be the designee here is because of our audit or QC
> process of the files when they come through post-closing, which
> we've talked about at length.  I don't think we thought about
> this as being our quality control unit for the Mortgage Corp.

Pls. Mem., Exh. F at 13.  The following exchange similarly illustrates Attig's lack of

preparedness:

> Q.    . . . This is a presentation to HUD, and M&T is making the argument to HUD that there was no what they call systemic process problem.  And under the first bullet point, M&T says to HUD: Independent QC performed weekly on five to ten percent of files.  What is that QC?
>
> A.    That is a QC under Debbie Boutillier's responsibility . . . where she's actually QCing the work that the auditor did on that file.  The file has already been QCed to the system.
>
> ***
>
> Q.    Okay.  From 1997 until the spring of 2004, what – did any of that QC, as far as you know, involve any search or analysis related to forgery or handwriting?
>
> A.    I don't know that specifically.  I didn't – I wasn't involved in the specifics associated with what we were QCing.  Debbie Boutillier managed that.
>
> ***
>
> Q.    So was any of that independent QC performed on case binders?
>
> A.    I would need to go back to Debbie.  It's for sure associated with the loan file audit; and I would assume, on a government loan, she would also be checking the auditor's work on the case binder audit.
>
> Q.    But you don't know.
>
> A.    But I don't know for sure.

Id. at 14.  Based on these excerpts, it appears that Attig's testimony was based on nothing more than her personal knowledge and that she did not fulfill her obligation to educate herself on other aspects of M&T's quality control process.  Under Rule 30(b)(6), M&T had the duty

prepare Attig so that she could testify on matters not only within her personal knowledge, but also on matters known to M&T.  See Alexander, 186 F.R.D. at 141; McKesson, 185 F.R.D. at 79; In re Vitamins Antitrust Litig., 216 F.R.D. at 172.  If, as M&T argues, Attig did in fact provide testimony on M&T's quality control process, such testimony is not reflected in the deposition excerpts provided to the Court.

Moreover, M&T's argument that additional Rule 30(b)(6) testimony is unnecessary because plaintiff has already been provided sufficient information on M&T's quality control process misses the purpose of Rule 30(b)(6).   Rule 30(b)(6) testimony is a sworn corporate admission that is binding on the corporation.  In contrast, Boutillier was deposed in her individual capacity, not as a corporate deponent, and, therefore, her testimony would not be considered an admission of M&T.  Similarly, the availability of an informative document, specifically the quality control manual, is not the equivalent of corporate testimony regarding the subject matter of that document.  See In re Vitamins Antitrust Litig., 216 F.R.D. at 174 (defendant corporation's argument that additional Rule 30(b)(6) deposition testimony would be duplicative on the ground that the information sought was available in documents that were previously produced was rejected because "the two forms of discovery are not equivalent").  To illustrate, a document can be given differing significance and meaning by different witnesses, but the testimony of a Rule 30(b)(6) deponent binds the corporation to the explanation given.  Moreover, the document at issue here, a manual, would only provide information as to instructions, guidelines, and policies, and not, for example, information about how those instructions, guidelines, and policies have been implemented.  Additional corporate testimony on M&T's quality control process, therefore, would not be duplicative of

25

previous discovery.

For the forgoing reasons, I will order M&T provide an alternative witness who is knowledgeable on topic number eleven for another Rule 30(b)(6) deposition.

> ### 2.    *The sixty-three loans identified on page nine of M&T's presentation to HUD*

Topic number sixteen is stated as, "[t]he 63 loans identified at p. 9 of the 6/10/04 HUD presentation, including FHA Case Number, M&T loan number, and other identifying information." Pls. Mem., Exh. I.  Based on the PowerPoint from the presentation to HUD, these "63 loans" were excluded from M&T's 108 potentially actionable loans because the "deficiency did not involve a signature, date or other authorization by [a] non-M&T employee." Pls. Mem., Exh. E at 9.  I assume this to mean that, when the sixty-three loans were audited, deficiencies were found, but those deficiencies did not involve documents missing the applicant's signature and, therefore, the loans could not contain forgeries and be actionable under this lawsuit.  According to plaintiff, Attig was unable to provide the requested testimony about the sixty-three loans, although Attig was aware that M&T had previously collected the requested information. Pls. Mem. at 26.

In opposition, M&T argues that Attig was knowledgeable about the sixty-three loans and provided sufficient testimony. Defs. Opp'n at 17.  M&T admits that Attig was not able to provide each loan's Federal Housing Administration case number and M&T loan number, but argues that Rule 30(b)(6) does not obligate a deponent to acquire such detailed information and that such detailed information would have been more appropriately sought via an interrogatory or document request. Id.

Although Rule 30(b)(6) requires a designated witness to thoroughly educate him or herself on the noticed topic, there must be a limit to the specificity of the information the deponent can reasonably be expected to provide. Without a photographic memory, Attig could not reasonably be expected to testify as to the loan numbers (and whatever other identifying information about which plaintiff would question the witness) for sixty-three different loans. See Promega Corp. v. Applera Corp., No. 01-C-244-C, 2002 WL 32340886, at *4 (W.D. Wisc. Nov. 27, 2002) ("it appears unrealistic to expect a [Rule 30(b)(6)] deponent to be intimately familiar with the details of every individual transaction described in a database"). Accordingly, I will not compel M&T to provide further corporate testimony on topic number sixteen.

> 3. *Identification of loans that went through Post-Closing Department and were subsequently sold*

Topic number nineteen is stated as, "[t]he identification of all loans which (a) were processed by M&T's government Post-Closing Unit (1997-2004) and (b) subsequently all or any interest in the loan was sold to another entity." Pls. Mem., Exh. I. According to plaintiff, Attig was unable to provide the requested identifying information about the loans processed through the Post-Closing Department that were subsequently sold, although she testified that M&T had previously identified the requested information. Pls. Mem. at 26. In opposition, M&T again argues that (1) no Rule 30(b)(6) deponent should be expected to provide such detailed information and (2) it has already produced this information in response to Interrogatory No. 18. Defs. Opp'n at 17.

I agree with M&T. At the deposition, plaintiff's counsel asked Attig whether she had

the loan numbers or HUD numbers for the 696 loans that were processed through post-closing and sold to another lender, excluding the loans sold to Chase Manhattan Mortgage. Pls. Mem., Exh. F at 11.  Attig explained that she did not have the information with her, but she had provided it to her attorneys. Id.  Although Rule 30(b)(6) requires a designated witness to thoroughly educate him or herself on the noticed topic, it should go without saying that the witness should not have to memorize hundreds of loan numbers.  Moreover, I have already determined that, in response to Interrogatory No. 18, M&T must provide the M&T loan number, the borrower's name, address, and social security number, the Federal Housing Administration Case Number, and the dollar amount of each of the 696 loans.  I can see no added benefit to compelling the same information through a Rule 30(b)(6) deposition because, like Rule 30(b)(6) deposition testimony, an interrogatory can be served on and answered by a corporation via its officers and agents. See Fed. R. Civ. P. 33(a).  Accordingly, I will not compel M&T to provide further corporate testimony on topic number nineteen.

        *4.    Identity of employees who audited the potentially actionable loans*

        Finally, topic number twenty-three is stated as, "[t]he identity of the employee who reviewed or handled each of the 108 Loans." Pls. Mem., Exh. I.  According to plaintiff, Attig was unable to identify which employees audited each of the 108 loans identified. Pls. Mem. at 26.  This Rule 30(b)(6) topic is exactly the same as Interrogatory No. 15.  As previously explained, it is not clear whether M&T has the capacity to readily ascertain who reviewed each loan through its software.  Moreover, as already explained, a Rule 30(b)(6) deponent cannot reasonably be expected to learn and retain such detailed information in preparation for his or her testimony.  To the extent that plaintiff may be entitled to further discovery on this

topic, such discovery need only be provided pursuant to Interrogatory No. 15 and not through further Rule 30(b)(6) deposition testimony.

## III.     CONCLUSION

For the forgoing reasons, plaintiff's motion to compel will be granted in part and denied in part.

_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE

Dated: