## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**UNITED STATES OF AMERICA**
**ex rel. ANNE M. FAGO**

**Relator,**

**BRINGING THIS ACTION ON**
**BEHALF OF THE UNITED STATES**
**OF AMERICA,**

**Plaintiffs,**

**v.**

**M & T MORTGAGE CORPORATION,**

**Defendant.**

</td><td>

**Civil Action 03-1406  (GK/JMF)**

</td></tr>
</table>

### MEMORANDUM OPINION

This case was referred to me for resolution of discovery disputes.  Currently pending before me is an *in camera* review of assertedly work product protected documents submitted by defendant pursuant to my March 31, 2006 order, as well as the following three motions: (1) Plaintiff's Motion (#2) to Compel Production of Testimony and Documents Concerning M&T's Personnel Actions; (2) Plaintiff's Motion (#3) to Compel Supplemental Discovery Responses Concerning 476 New Loans; and (3) defendant's Motion for Payment of Expert Witness Fees. For the reasons stated herein, defendant's assertion of work product protection for the *in camera* documents will be sustained in part and overruled in part, plaintiff's second motion to compel will be granted in part and denied in part, and plaintiff's third motion to compel and defendant's motion for expert fees will both be denied.

## I.      BACKGROUND

Relator Anne Fago ("plaintiff" or "Fago") brought this *qui tam* action on behalf of the

United States against her former employer M&T Mortgage Corporation ("M&T") alleging that

M&T violated the False Claims Act, 31 U.S.C. § 3729 *et seq*.[1] Amended Complaint ("Am.

Compl.") at 2-4.  M&T is a "Direct Endorser" of mortgages insured by the Department of

Housing and Urban Development ("HUD"). Fago v. M&T Mortgage Corp., 235 F.R.D. 11, 13

(D.D.C. 2006).  These government-insured mortgages are typically made to low income, first

time home buyers and buyers with spotty credit histories. Am. Compl. at 5.  When these

government-insured loans go into default, M&T presents a claim for payment of the loan to

HUD, HUD pays M&T, and then HUD becomes the owner of the property. Id. at 6.  Plaintiff

brought this lawsuit alleging that M&T submitted applications to HUD for loan guaranties that

contained forgeries, thereby fraudulently causing HUD to guarantee and subsequently pay claims

for loans that it otherwise would not have insured. Id. at 3.

## II.     ANALYSIS

### A.      *In Camera* Review

Plaintiff previously moved the Court to compel the production of documents and certain

deposition testimony relating to a presentation to HUD that M&T made on June 10, 2004.  In

particular, plaintiff sought the production of all documents that were created in the course of an

internal investigation, conducted by M&T's outside counsel, into plaintiff's allegations and

---

[1] All citations to the United States Code are to the electronic version available on
Westlaw and Lexis.

subsequently discussed in the presentation to HUD.  See Fago, 235 F.R.D. at 15.  M&T refused to

produce the requested documents and testimony on the ground that they were protected by the

work product doctrine.  In moving to compel their production, plaintiff argued that the documents

and testimony are not work product and that, even if they are work product, M&T waived work

product protection by presenting the findings of its investigation to HUD. Id. at 15.  In considering

plaintiff's motion, I found that, without viewing the documents *in camera*, I could not determine

whether they were created "because of" litigation or whether work product protection had been

waived via the presentation to HUD. Id. at 17.

I have now reviewed the documents *in camera* and find that some, but not all, constitute

work product and that, for the documents that constitute work product, protection was not waived

by M&T's presentation to HUD.  For the same reasons, work product protection was not waived

for the sought-after deposition testimony.

### 1.    *Work Product Doctrine*

The work product doctrine is designed to balance the need of the adversary system to

promote an attorney's preparation against society's general interest in revealing all facts relevant

to the resolution of a dispute. In re Sealed Case, 856 F.2d 268, 273 (D.C. Cir. 1988) (citing In re

Subpoenas Duces Tecum, 738 F.2d 1367, 1371 (D.C. Cir. 1984)).  A lawyers's work product may

be reflected in "interviews, statements, memoranda, correspondence, briefs, mental impressions,

personal briefs, and countless other tangible and intangible ways." Hickman v. Taylor, 329 U.S.

495, 511 (1947).  "Were such materials open to opposing counsel on mere demand, much of what

is now put down in writing would remain unwritten [and] [a]n attorney's thoughts, heretofore

inviolate, would not be his own." Id.  In furtherance of this principle, Rule 26 of the Federal Rules

of Civil Procedure protects from disclosure materials prepared by or for a party, its attorney, or its representative in anticipation of litigation and allows for discovery only upon a showing of substantial need and an inability to obtain the substantial equivalent without undue hardship. Fed. R. Civ. P. 26(b)(3).

In order for documents to be protected by the work product doctrine, the proponent must show that the documents were prepared or obtained *in anticipation of litigation*. Id. "'In anticipation of litigation' contains two related, but nevertheless distinct, concepts. One is temporal. The other is motivational." Jinks-Umstead v. England, 231 F.R.D. 13, 15 (D.D.C. 2005) (quoting Edna Selan Epstein, The Attorney-Client Privilege and the Work Product Doctrine, at 314 (4th ed. 2001)). First, at the time the document was prepared or obtained, there must have been at least "a subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable." EEOC v. Lutheran Soc. Servs., 186 F.3d 959, 968 (D.C. Cir. 1999) (citing In re Sealed Case, 146 F.3d 881, 884 (D.C. Cir. 1998)). Second, the document must have been "prepared or obtained *because of* the prospect of litigation." Lutheran Soc. Servs., 186 F.3d at 968 (quoting Senate of Puerto Rico v. United State Dep't of Justice, 823 F.2d 574, 586 n.42 (D.C. Cir. 1987)) (emphasis added). The operative question is whether the "documents 'would have been created in essentially similar form irrespective of the litigation.'" Willingham v. Ashcroft, 228 F.R.D. 1, 4 (D.D.C. 2005) (citing United States v. Adlman, 134 F.3d 1194, 1202-03 (2d Cir. 1998)).

In the present case, plaintiff argued that the investigation, and therefore the documents created pursuant to that investigation, was not work product because it was conducted for the business purpose of explaining the situation to HUD. Fago, 235 F.R.D. at 16. On the other hand,

M&T asserted that any non-litigation purpose coincidently served by its investigation was purely collateral to the principal purpose of defending plaintiff's lawsuit. Id.  In reality, it appears that M&T's investigation had dual purposes: one, to gather information in preparation of this litigation, the other, to reassure HUD and preserve its standing as a direct endorser of government-insured mortgages.  Accordingly, the issue in this case is whether the documents surrounding M&T's investigation and referenced in its presentation to HUD were prepared or obtained "because of" the litigation and would not have been created in an "essentially similar form irrespective of the litigation."

### 2.    Are the Documents Work Product?

The documents submitted for *in camera* review fall into five general categories: (1) attorney notes from interviews with current and former M&T employees; (2) notes and questionnaires from employee exit interviews; (3) internal audits; (4) correspondence from M&T's counsel regarding this litigation; and (5) compilations of information.

The attorney interview notes are classic opinion work product.  Specifically, those notes reveal counsel's mental impressions and litigation strategy because they reveal who counsel thought important to interview, what questions counsel thought important to ask, and what information counsel thought important to memorialize.  See Hickman, 329 U.S. at 512-13.  It is also clear that the interview notes would not have been created and the interviews would not have taken place had it not been for the present litigation.  Indeed, all of the interviews took place *after* the service of plaintiff's complaint on M&T.  To the extent that the information obtained in these interviews may have been helpful in M&T's meeting with HUD or to the extent that M&T may have conducted the interviews in a more speedy or thorough manner in order to quickly gather

information with which to alleviate any concerns of HUD, that would not alter the application of

the work product doctrine because it is clear that these documents would not have been created in

essentially similar form irrespective of the litigation.

With regard to the exit interview documents, I find that they were not created in

anticipation of litigation.  First, they were all created prior to the filing of this lawsuit and almost

all were created before plaintiff began working for M&T.  Accordingly, there can be no doubt that

they were not created in anticipation of the present litigation.  Second, the exit interview forms

themselves state that they are "strictly for use by the Human Resources Department to assist in

evaluating current policies and practices and identifying potential areas for improvement."  That

statement establishes that they were not prepared because of litigation, but rather to assist the

Human Resources Department.  To the extent that M&T may be asserting work product protection

based on the fact that the exit interview notes and questionnaires may have been *gathered* as part

of its defense of plaintiff's lawsuit, that would be an inappropriate application of the work product

doctrine.  Specifically, pre-existing documents in M&T's possession are not made privileged

merely because they may be useful in this litigation.  As the Supreme Court explained in the

context of the attorney-client privilege:

> This Court and the lower courts have thus uniformly held that pre-existing documents which could have been obtained by court process from the client when he was in possession may also be obtained from the attorney by similar process following transfer by the client in order to obtain more informed legal advice.

Fisher v. United States, 425 U.S. 391, 403-04 (1976).  Accordingly, I find that the exit interview

notes and questionnaires are not work product and must be produced to plaintiff.

With regard to the two internal audits, there is nothing on their face or provided in the

6

privilege log to indicate that the audits were conducted in anticipation of litigation.  Accordingly, I find that the two internal audits must be produced to plaintiff.

There is one memorandum from M&T's Associate General Counsel to M&T officials regarding this litigation.  This memorandum is unquestionably attorney work product.

Finally, there are two charts reflecting compilations of information that appear to have been created in the course of the preparation of M&T's defense of the lawsuit.  First, both of these charts were created shortly after service of plaintiff's complaint and during the same period that M&T's counsel was conducting interviews.  Second, these charts reveal the mental impressions and litigation strategy of counsel by indicating what information counsel thought was important to gather.  These charts, therefore, are classic work product and were clearly created because of this litigation.

Accordingly, with the exception of the exit interviews and the two internal audits, I will sustain M&T's claim of work product protection for the documents submitted for *in camera* review.

### 3.    *Did M&T Waive Work Product Protection?*

Having found that some of the documents are indeed work product, I must now determine whether M&T waived work product protection for those documents and for deposition testimony regarding its investigation by electing to share certain information with HUD in its June 10, 2004 presentation.  Based on the proceeding discussion, the only documents at issue are counsel's interview notes, the one memorandum from counsel to M&T officials, and the two charts.

Disclosure of a document protected by the work product doctrine typically waives work product protection for that document.  See In re United Mine Workers of Am. Employee Benefit

7

Plans Litig., 159 F.R.D. 307, 310 (D.D.C. 1994) (citing Wichita Land & Cattle Co. v. Am. Fed. Bank, 148 F.R.D. 456, 460-61 (D.D.C. 1992)).  In certain circumstances, the disclosure of one document waives protection not only for that actual document, but also for documents relating to the same subject matter, which were not disclosed.  See Bowles v. Nat'l Ass'n of Home Builders, 224 F.R.D. 246, 259 (D.D.C. 2004).  This principle is commonly referred to as subject matter waiver.  In the context of attorney work product, courts only find subject matter waiver when ordering the disclosure of the additional documents would be consistent with the purpose of the work product doctrine, which is the promotion of the adversary system by safeguarding the fruits of an attorney's trial preparations from the opponent. United Mine Workers, 159 F.R.D. at 312 (court refused to find subject matter waiver where work product was not disclosed to gain a tactical litigation advantage and such broad disclosure would result in a strategic windfall for the opponent).  See also Rockwell Int'l Corp. v. U.S. Dep't of Justice, 235 F.3d 598, 604-07 (D.C. Cir. 2001) (court refused to find subject matter waiver for undisclosed documents that were quoted in a report on the ground that such broad waiver was not necessary to protect the adversary system); Bowles, 224 F.R.D. at 259 (where defendant only disclosed the work product documents that supported its argument and not the documents that did not support its argument, the court found that subject matter waiver was necessary to promote the adversary system by ensuring that the evidence in the record would not be one-sided).  In situations where the court finds that subject matter waiver is necessary to promote the adversary system, it is within the court's "discretion to define the subject matter of the disclosed documents narrowly to prevent the scope of the subject matter waiver from being unduly broad." United Mine Workers, 159 F.R.D. at 309.

In moving to compel, plaintiff argued that M&T waived work product protection as to all

documents relating to its investigation by disclosing its findings and conclusions to HUD. <u>Fago</u>, 235 F.R.D. at 16.  In arguing waiver, M&T relies on a PowerPoint that M&T used in its presentation.  Judge Kessler previously found that M&T waived work product protection for the PowerPoint itself because it was in fact disclosed to HUD.  <u>See</u> Apr. 15, 2005 Order.  In this PowerPoint presentation, M&T referenced some of the preliminary findings of its internal investigation.  In moving to compel, plaintiff argued that these references should result in a waiver of work product protection for all of the documents created in the course of the investigation or that were relied upon by M&T in making its presentation to HUD, as well as deposition testimony about the same. <u>Fago</u>, 235 F.R.D. at 15.

In opposing plaintiff's motion, M&T argued that such broad subject matter waiver would be inappropriate because its disclosure to HUD was limited, M&T merely represented to HUD that it was providing the findings of an ongoing investigation, HUD was not M&T's adversary, and the disclosure was made pursuant to a Federal Housing Administration regulation. <u>Id.</u> Moreover, M&T asserted that it does not, as plaintiff contends, intend to use HUD's failure to take administrative action against it to support its defense of this lawsuit. <u>Id.</u> at 17.

Before further discussion, an important distinction must be drawn.  Plaintiff is not presently seeking a finding of waiver as to documents actually disclosed to a third-party.  The extensive case law regarding selective disclosure to one adversary, but not another, is therefore inapplicable.  The issue of selective waiver was before Judge Kessler when she ordered M&T to produce the PowerPoint presentation that was used in the presentation to HUD.  Plaintiff is now seeking the production of work product documents *that were never disclosed to any third-party*, but merely referenced in a presentation to its government regulator.  Accordingly, the law

provided in cases such as <u>Rockwell</u> and <u>United Mine Workers</u> (both cited above), which consider whether *additional,* undisclosed information must be produced to protect the adversary system, govern the present dispute.

In an analogous case, the court of appeals refused to find subject matter waiver.  <u>See</u> <u>Rockwell Int'l Corp. v. U.S. Dep't of Justice</u>, 235 F.3d 598, 604-07 (D.C. Cir. 2001).  In <u>Rockwell</u>, a report of an internal investigation by the Department of Justice was made public, but the attachments, which were work product, were not made public. <u>Id.</u> at 601.  Those attachments were referenced and quoted in the body of the report. <u>Id.</u>  In a subsequent Freedom of Information Act lawsuit, plaintiffs argued that the Department of Justice waived work product protection for the attachments by referencing and quoting them in the report. <u>Id.</u> at 604.  The court of appeals disagreed. <u>Id.</u> at 607.  Distinguishing the case from the same line of cases that Fago relies on, the court of appeals explained that the plaintiffs did not need the documents to cross-examine a trial witness who had testified about only portions of the documents, <u>see United States v. Nobles</u>, 422 U.S. 225 (1975), and plaintiffs had not assured the party to which they disclosed protected information that they were making available *all* files or documents relating to the subject matter at issue, <u>see In re Martin Marietta Corp.</u>, 856 F.2d 619 (4th Cir. 1988) and <u>In re Sealed Case</u>, 676 F.2d 793 (D.C. Cir. 1982). <u>Id.</u> at 605-07.  As the court of appeals explained, "all three cases required disclosure at least in part because their particular circumstances made doing so necessary to protect that adversary system." <u>Id.</u> at 606.

Similarly, I find that, under the circumstances of this case, subject matter waiver would be contrary to, rather than promote, the underlying purposes of the attorney work product doctrine. Plaintiff has not shown that disclosure of M&T's opinion work product would promote the

adversary system.  In her motion to compel, plaintiff asserted that disclosure of the information underlying the presentation would be the only fair thing to do because "M&T made the strategic choice to disclose the results of its investigation to HUD [and] it cannot prevent plaintiff from obtaining the same information, as Judge Kessler has ruled." Memorandum in Support of Plaintiff's Motion to Compel at 15.  As plaintiff explained, she wants "a level playing field." Id. However, contrary to plaintiff's assertion, I find that she is already on a level playing field. Pursuant to Judge Kessler's order, plaintiff was provided with a copy of M&T's PowerPoint presentation.  To provide plaintiff with more, such as opposing counsel's extensive interview notes, would not level the playing field, but rather, would give plaintiff an unjustified advantage. Such a windfall would be contrary to the protection of the adversary system.  See United Mine Workers, 159 F.R.D. at 312.

Conversely, plaintiff would not be prejudiced by not receiving the additional information she now seeks.  As M&T explained in its opposition, it is not planning to use, as plaintiff suggests, HUD's decision not to take administrative action to its advantage in this litigation. Accordingly, plaintiff would not be unfairly prejudiced by any lack of information with which to attack HUD's conclusion.  Moreover, during the discovery phase of this litigation, plaintiff would have had access to the knowledge held by the M&T employees who were interviewed as part of the investigation through the appropriate discovery methods; requiring the disclosure of counsel's interview notes is completely unwarranted.  See Hickman, 329 U.S. at 510-11.

Further, the documents and testimony that plaintiff seeks are the most protected of all attorney work product – documents that contain, and testimony that reveals, attorney mental impressions.  Although it would be extreme to say that subject matter waiver could never apply to

opinion work product, at least one district court has so held, see Canel v. Lincoln Nat'l Bank, 179

F.R.D. 224, 227 (N.D. Ill. 1998), and it would logically require a stronger showing to demonstrate

that its disclosure would be necessary to protect the adversary system.

Accordingly, I find that subject matter waiver would not be appropriate under the present

circumstances.

### B.     Plaintiff's Motion to Compel Personnel Discovery

Plaintiff has moved the Court to compel M&T to provide Rule 30(b)(6) corporate

testimony relating to three M&T employees: Suzanne Palmer, Camille Bettcker, and Christine

Meier, all of whom plaintiff alleges participated in "M&T's scheme to defraud HUD." Plaintiff's

Motion (#2) to Compel Production of Testimony and Documents Concerning M&T's Personnel

Actions ("Pls. Mot.") at 1.  Plaintiff also seeks documents generated in connection with the

termination of Palmer. Id.  Specifically, plaintiff seeks testimony about M&T's decision to place

Palmer, Bettcker, and Meier on administrative leave and then terminate Palmer's employment.

Plaintiff's Memorandum in Support of Her Motion (#2) to Compel Production of Testimony and

Documents Concerning M&T's Personnel Actions ("Pls. Mem.") at 2.

#### 1.     Deposition Testimony

Plaintiff argues that the sought after corporate testimony is not protected by the attorney-

client privilege because (1) personnel decisions are business decisions and (2) the underlying *facts*

concerning M&T's personnel decisions are not privileged. Pls. Mem. at 5.  In opposition, M&T

argues that its counsel was specifically retained to provide legal advice regarding the employment

status of the employees referenced in plaintiff's complaint and that all of the resulting personnel

actions relating to Palmer, Bettcker, and Meier were based on the legal advice sought and received

12

from counsel. Defendant's Memorandum in Opposition to Relator's Second Motion to Compel ("Defs. Opp'n") at 6.  In response to plaintiff's assertion that she is entitled to the discovery of *facts* underlying the attorney-client communications, M&T argues that the specific deposition questions posed by plaintiff's counsel were not designed to elicit facts. Id. at 7.

In this circuit, "the attorney-client privilege is narrowly circumscribed to shield from disclosure only those communications from a client to an attorney made in confidence and for the purpose of securing legal advice." Evans v. Atwood, 177 F.R.D. 1, 3 (D.D.C. 1997) (citing Tax Analysts v. IRS, 117 F.3d 607, 617 (D.C. Cir. 1997)); In re Sealed Case, 737 F.2d 94, 98 (D.C. Cir. 1984).  Communications from the attorney to the client are protected only insofar as the attorney's communication discloses an attorney-client privileged communication from the client. Evans, 177 F.R.D. at 3 (citing Brinton v. United States Dep't of State, 636 F.2d 600, 603-04 (D.C. Cir. 1980)).  The purpose of the privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of the law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981).  The privilege "rests on the need for the advocate to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out." Id.  To that end, the privilege "applies to only communications made to an attorney in his capacity as legal advisor." Neuder v. Battelle Pac. Nw. Nat'l Lab., 194 F.R.D. 289, 292 (D.D.C. 2000) (citations omitted). "Relatedly, 'communications by a corporation with its attorney, who at the time is acting solely in his capacity as a business advisor, would not be privileged.'" Id. (quoting Great Plains Mut. Ins. Co. v. Mut. Reinsurance Bureau, 150 F.R.D. 193, 197 (D. Kan. 1993)).

Plaintiff argues that corporate testimony relating to M&T's personnel decisions is not

13

protected by the attorney-client privilege because those decisions were inherently business decisions and that any legal advice concerning the personnel actions was incidental to M&T's business concerns. Pls. Mem. at 5-6.  She argues that M&T cannot shield discovery of information relating to its personnel decisions by "injecting" counsel into those decisions. Id. at 5. Plaintiff's repeated assertion that personnel decisions are business decisions, however, misses the point.  Although personnel decisions may generally be business decisions, that does not mean that M&T could not have sought and obtained legal advice about such decisions.

The cases that plaintiff relies on to support her argument that personnel decisions were business decisions do not actually so hold.  Rather, those cases examined the role that a particular attorney played in the decision making process to determine whether he was acting in a legal or business capacity.  See Nesse v. Shaw Pittman, 202 F.R.D. 344 (D.D.C. 2001); Neuder v. Battelle Pacific Northwest Nat'l Laboratory, 194 F.R.D. 289 (D.D.C. 2000).  In Nesse, the court found that a partner at a law firm was not acting in a legal role when he met with the firm's management committee to decide whether a particular attorney should remain at the firm. Nesse, 202 F.R.D. at 358.  Similarly, in Neuder, the court found that a lawyer who participated in a standing personnel committee was serving on that committee in a business role and not for the purpose of providing legal services or advice. Neuder, 194 F.R.D. at 293-95.  Unlike both of those cases, M&T's counsel appears to have been acting as a legal advisor when it investigated and made recommendations regarding the personnel decisions at issue.  M&T's communications to counsel in pursuit of and in receipt of legal advice regarding personnel decisions would be privileged.  The question that needs to be asked is not whether personnel decisions are business decisions, but rather whether the deposition questions at issue would reveal confidential communications from

14

M&T and its employees to its counsel that were made for the purpose of securing legal advice.

As demonstrated by M&T's counsel's affidavit, he was retained to investigate plaintiff's allegations, to formulate a defense to those allegations, and to make recommendations regarding the employment status of M&T employees expressly referenced in plaintiff's complaint. Defs. Opp'n at 2-3, Exh. A. According to M&T, all of the information on which its counsel relied in making the employment related recommendations at issue were gathered during the attorney-client privileged interviews of M&T employees. Id. at 3, 6. As the United States District Court for the District of Connecticut explained:

> [C]laims to privilege . . . will not be circumvented by framing the
> question to request reasons for a decision when there is every
> indication that those reasons are limited to reliance on protected
> legal advice. It is true that a client's knowledge of facts may not be
> cloaked under the attorney-client privilege by incorporating a
> statement of those facts in a communication to the attorney. But
> privileged advice does not lose its protection when the client adopts
> it. To allow a litigant to probe beyond the assertion of privilege to
> the substance of the legal advice because the client takes the advice
> to heart and acts upon it would effectively circumvent the protection
> of the privilege. For this reason when a deponent answered a
> question about his reasons by saying that he was only relying on his
> attorney's legal advice, that answer is a sufficient response.

SCM Corp. v. Xerox Corp., 70 F.R.D. 508, 516-17 (D. Conn. 1976). Applying this reasoning to the case at hand, to the extent that M&T relied solely on advice from counsel in making the personnel decisions and to the extent that counsel based his advice solely on information gathered in confidential employee interviews, the basis of such decisions would be privileged.

However, I cannot make such a nuanced determination on the information presently before me. The deposition questions and testimony provided to the Court in the parties' briefs do not provide enough information for me to ascertain the extent or nature of M&T's counsel's

involvement in the personnel decisions at issue.  It is clear that M&T's counsel was involved, to some extent, in the personnel decisions as a legal advisor and the conversations that occurred as part of that involvement would be privileged.  However, there may be some information about which plaintiff would be entitled to inquire at the deposition.  Accordingly, I will order that the corporate deposition be resumed before me on Thursday, September 7, 2006 at 10:30 a.m. in my chambers.  The deposition shall last no more than one hour and I reserve the right to ask questions *ex parte* if necessary to determine the scope and nature of counsel's involvement.  Plaintiff's counsel shall be responsible for arranging to have a court reporter present.

### 2.    *Palmer Documents*

Plaintiff is also seeking production of documents generated in connection with Palmer's termination, including any documents placed in her personnel file. Pls. Mem. at 2.  Very little information was presented to the Court about these documents, and the parties' arguments for and against their production are not apparent.  As a threshold matter, plaintiff did not provide the Court with a copy of the request for production to which she claims these documents are responsive.  Moreover, in opposition to plaintiff's motion, M&T does not even mention the documents – although M&T may have intended its arguments to apply to both the documents and the deposition questions, that is not clear.  In the interests of expedition, I will review the documents *in camera*.  To that end, M&T shall provide a copy of the documents relating to Palmer's termination to chambers and plaintiff shall provide a copy of the discovery request to which she claims such documents are responsive no later than ten business days from the date of this memorandum opinion.

### C.    Plaintiff's Motion (#3) to Compel Supplemental Discovery Responses

**Concerning 476 Additional Loans**

Plaintiff has also moved the Court to compel M&T to supplement its discovery responses for 476 particular loans and provide, for each of those loans, the following information: "(i) the loan servicing history; (ii) claim payment information; (iii) the M&T loan file; and (iv) the identity of the M&T employee who audited each loan." Plaintiff's Memorandum in Support of Her Motion (#3) to Compel Supplemental Discovery Responses Concerning 476 New Loans ("Pls. Supp. Disc. Mem.") at 1. I find that plaintiff is not entitled to this supplemental discovery because it is not responsive to any of the discovery requests on which she relies. To understand why plaintiff is not entitled to this information, her motion must be viewed in the context of discovery to date.

Plaintiff previously moved this Court to compel M&T to provide, among other things, complete responses to various interrogatories and document requests that purportedly related to how M&T identified the universe of loans that it believed could possibly contain forgeries and, therefore, be actionable in this lawsuit. See Fago, 235 F.R.D. at 17. Specifically, for the loans that M&T had identified as potentially actionable via a detailed filtering process, plaintiff wanted M&T to be compelled to provide the name of the M&T employee who had reviewed each loan and the amount of any reimbursement that HUD may have received on the loans from the subsequent sale of the property. Id. at 17-19. Plaintiff also moved to the Court to compel a complete response to Interrogatory No. 18, by which plaintiff sought "the identity of all of the loans that went through the offending Post-Closing Department and were then sold by M&T to another entity." Id. at 20-21. For each loan that was processed through the Post-Closing Department and subsequently sold, plaintiff wanted the M&T loan number, the borrower's name,

address, and social security number, the Federal Housing Administration Case Number, and the dollar amount of the loan. Id. at 20.  It is significant to plaintiff's present motion that Interrogatory No. 18 was not limited to the loans that M&T had identified as potentially actionable, but rather, related to *all* loans that were processed through M&T's Post-Closing Department and subsequently sold to another entity.  In ordering M&T to fully respond to Interrogatory No. 18, I explained that M&T had not provided sufficient evidence to convince the Court that it would be unduly burdensome to produce the sought-after information and that M&T had not refuted plaintiff's assertion that she needed the identifying information in order to request more detailed information from HUD or other entities. Id. at 21.  In compliance with that order, M&T identified 476 additional loans. Defendant's Memorandum in Opposition to Relator's Motion to Compel ("Defs. Opp'n to Supp. Disc. Mot.") at 4.

Plaintiff now wants M&T to be compelled to provide additional information for the 476 loans that M&T identified pursuant to my March 31, 2006 order.  Plaintiff argues that she is entitled to this additional information via two possible paths.  One path is through Document Request No. 37.  Document Request No. 37 is a catch-all request in which plaintiff requested, "[a]ny other documents not requested above that relate to the subject matter of this litigation or that otherwise support, evidence, refute or contradict any claims alleged in the Amended Complaint." Fago, 235 F.R.D. at 21.  However, as I explained in my March 31, 2006 opinion, plaintiff's expansive interpretation of Document Request No. 37 would essentially obligate M&T to make a good-faith search of *all* of its documents that could possibly relate to this lawsuit, regardless of whether such documents would support, evidence, refute or contradict any of plaintiff's claims, and that such an obligation "would eviscerate the Rule 34 discovery process

18

because a party could simply propound one catch-all document request and expect opposing counsel to do its work for it." Id. at 22.  Such a catch-all request cannot operate as a substitute for tailored document requests.  Accordingly, I will not order M&T to produce the additional loan information via a supplementation to its response to Document Request No. 37.

The other path by which plaintiff argues entitlement to the additional loan information is by changing the meaning of the phrase "the potential universe of actionable loans" from what it has clearly been understood to mean up to this point.  As M&T has repeatedly explained, it applied a series of filters to all of its federally insured loans to arrive at the universe of loans that could possibly be actionable. Defs. Opp'n to Supp. Disc. Mot. at 3.[2]  Through this filtering process, M&T identified eighty-six loans that could be potentially actionable.  When plaintiff propounded her discovery requests, many of the requests were expressly limited to these eighty-six loans.  Indeed, several of the issues addressed in my March 31, 2006 opinion dealt with such requests.  Over the course of discovery, M&T determined that there were more than eighty-six potentially actionable loans, increasing the number to 117 loans. Id. at 3.  Recognizing that plaintiff's intent in propounding the discovery requests that were limited to the eighty-six loans

---

[2] "First, [M&T] screened . . . its federally insured loans and segregated only those loans which had been processed through its Buffalo Post Closing Unit over the course of the accused manager's tenure, January 1, 1997 through April, [sic] 2004.  Next, [M&T] further segregated the remaining loans on the basis of whether a claim for insurance or partial claim for insurance was made with HUD.  Only those loans which involved a claim of any nature were left within the universe for further evaluation.  Of those loans processed by its Buffalo Post Closing Unit during the relevant period which resulted in any sort of a claim to HUD, [M&T] further filtered out those loans which, according to its audit reports (which are prepared upon receipt of the loan documents from the settlement attorney) had no deficiencies and hence no need for a forgery.  Finally, [M&T] filtered out those loans which may have involved a deficiency but again, according to the audit report, did not involve loan documents with missing external signatures." Defs. Opp'n to Supp. Disc. Mot. at 3.

was surely to obtain information about the loans that M&T had identified as the "potential

universe of actionable loans," M&T supplemented its responses with information regarding the

additional thirty-one loans that they had added to their "potential universe of actionable loans."

Accordingly, M&T had voluntarily, and quite appropriately, provided the requested information

for all 117 loans. Id. at 2-3.  In moving to compel, plaintiff now argues that the 476 additional

loans are "potentially actionable" and, therefore, fall within the "potential universe of actionable

loans" identified by M&T and that M&T should be ordered to supplement its responses to the

discovery requests that, as written, were limited to the original eighty-six potentially actionable

loans.

It is clear from the briefing in this case that the phrase "potential universe of actionable

loans" refers to the loans that were identified by M&T through its detailed filtering process.

When I ordered M&T to produce additional information, in response to Interrogatory No. 18, I in

no way changed the scope of plaintiff's other discovery requests.  To say that the "potential

universe of actionable loans" has been increased by 476 loans, contorts the history of this case.

Although, in theory, all loans that were processed through M&T's Post-Closing Department are

potentially actionable, that does not change the fact that plaintiff's discovery requests were limited

to the eighty-six loans that M&T identified as being the "potential universe of actionable loans."

That was clearly M&T's understanding when it previously supplemented its answers for all 117

loans.  Other than Document Request No. 37, discussed above, plaintiff bases her entitlement to

the supplemental information solely on discovery requests that were expressly limited to the

eighty-six loans. Pls. Mem. at 2-3.  Accordingly, I find that plaintiff is not entitled to the

additional identifying loan information that she seeks via supplementation to the discovery

requests on which she relies.

      **D.**    **Defendant's Motion for Expert Witness Fees**

      M&T has moved the Court, pursuant to Rule 26(b)(4)(C) of the Federal Rules of Civil

Procedure, for an order "requiring that Relator pay for the reasonable fees for time spent by

[M&T's] testifying experts in responding to Relator's discovery in the amount of $4,291.00."

Memorandum of Points and Authorities in Support of Motion for Payment of Expert Witness Fees

("Def. Mem.") at 1.  In August 2005, plaintiff deposed M&T's three testifying expert witnesses.

Id. at 2.  The three experts billed M&T for the time they spent at the deposition, the costs and

travel related to appearing at the deposition, and the time spent preparing for the deposition. Id.

Plaintiff has reimbursed M&T for all of these expenses, except for the time the experts spent

preparing for their depositions. Id.

      Rule 26(b)(4), which governs discovery related to expert witnesses, provides, "Unless

manifest injustice would result, (i) the court shall require that the party seeking discovery pay the

expert a reasonable fee *for the time spent in responding to discovery* under this subsection." Fed.

R. Civ. P. 26(b)(4)(C) (emphasis added).  The present issue is whether the time that an expert

spends preparing for a deposition is encompassed by the language "time spent responding to

discovery."  M&T argues that preparation time is included. Def. Mem. at 3.  In opposition,

plaintiff asserts that "[t]he general rule is that the party deposing the expert is not required to bear

the expense of the time that expert, or his or her attorney, decide to spend preparing for

deposition." Memorandum in Opposition to Defendant's Motion for Payment of Expert Witness

Fees ("Pls. Opp'n") at 2.  Plaintiff further argues that, although there are exceptions to this

purported general rule, none of those exceptions are applicable here. Id. at 2-3.

Neither of the parties cite to any case law from this circuit, and I have found none, that answers the question of whether the general rule is that preparation time is included or whether the general rule is that it is not included in the scope of Rule 26(b)(4)(C).  The only case from this circuit to which either party cites is Haarhuis v. Kunnan Enter., Ltd., 177 F.3d 1007 (D.C. Cir. 1999).  In Haarhuis, the court of appeals permitted compensation for the expert's travel expenses and for the time spent at the deposition, neither of which is in dispute in this case, but it makes no reference to preparation time.  See Haarhuis, 177 F.3d at 1015-16.  Although the language "time spent responding to discovery" is broad and arguably would include preparation time, there are practical problems to a general rule of including preparation time.  As the United States District Court for the Northern District of Illinois explained:

> time spent "preparing" for a deposition entails not only the expert's review of his conclusions and their basis, but also consultation between the responding party's counsel and the expert to prepare the experts to best support the responding party's case and to anticipate questions from seeking parties' counsel.  An expert's deposition is in part a dress rehearsal for his testimony at trial and thus his preparation is part of the other's trial preparation.  One party need not pay for the other's trial preparation.

Rhee v. Witco Chem. Corp., 126 F.R.D. 45, 48 (N.D. Ill. 1989).  On the other hand, there may be circumstances that increase the probability that the time an expert spent preparing for a deposition was solely or predominantly for the purpose of responding to the opposition party's discovery, such as where the expert has to testify about particularly complex issues or where there has been a lapse of time between the completion of the expert's report and the expert's deposition.  See Flemming v. United States, 205 F.R.D. 188, 190 (W.D. Va. 2000); S.A. Healy Co. v. Milwaukee Metro. Sewerage Dist., 154 F.R.D. 212, 214 (E.D. Wisc. 1994); Rhee, 126 F.R.D. at 47.

Accordingly, I will not find that, as a general matter, preparation time is included within "time spent responding to discovery" and find instead that the circumstances of the individual case must be examined.

In the present case, no circumstances have been brought to the Court's attention to render reimbursement for the expert witnesses' preparation time appropriate. Indeed, as plaintiff points out, it appears that the issues in this case are not particularly complex and the experts' were deposed within three months of the production of their reports. See Pls. Opp'n at 3. Moreover, in moving to compel reimbursement, M&T did not provide any reasons, other than the assertion of a general rule that preparation time is included, as to why preparation time should be included under the circumstances of this litigation. Accordingly, M&T's motion for expert fees will be denied.

## III.    CONCLUSION

For the forgoing reasons, defendant's assertion of work product protection for the *in camera* documents will be sustained in part and overruled in part, plaintiff's second motion to compel will be granted in part and denied in part, and plaintiff's third motion to compel and defendant's motion for expert fees will both be denied.


                                    _____
                                    JOHN M. FACCIOLA
                                    UNITED STATES MAGISTRATE JUDGE
Dated: