**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, <u>ex</u> <u>rel</u>. ANNE M. FAGO, )<br><br>           Relator, )<br><br>BRINGING THIS ACTION ON BEHALF OF THE UNITED STATES OF AMERICA, )<br><br>           Plaintiff, )<br><br>   v. )<br><br>M & T MORTGAGE CORPORATION, )<br><br>           Defendant. ) | Civil Action No. 03-1406 (GK) |

<u>MEMORANDUM OPINION</u>

Plaintiff Anne M. Fago brings this <u>qui</u> <u>tam</u> suit under the False Claims Act, 31 U.S.C. §§ 3729 <u>et</u> <u>seq</u>., on behalf of the United States against Defendant M & T Mortgage Corporation ("MTMC"). This matter is before the Court on the following motions: (1) Defendant's Motion for Summary Judgment [**Dkt. No. 51**]; (2) Defendant's Supplemental Motion for Summary Judgment [**Dkt. No. 104**]; and (3) Plaintiff's Motion to Strike Declarations and Interrogatory Answers Submitted with Defendant MTMC's Supplemental Motion for Summary Judgment [**Dkt. No. 107**]. Upon consideration of the Motions, Oppositions, Replies, Surreply, and the entire record herein, and for the reasons stated below, Defendant's Motion for Summary Judgment is **granted in part and denied in part**; Plaintiff's

Motion to Strike is **granted**; and Defendant's Supplemental Motion for Summary Judgment is **granted in part and denied in part**.

**I.    BACKGROUND**

  **A.    Facts[1]**

MTMC is a subsidiary of M & T Bank and is engaged in the home mortgage lending business.  Plaintiff Ann Fago went to work for MTMC's Post Closing Department in Buffalo, New York in July 2001. One function of the Post Closing Department is to audit mortgage loan files or "binders" for completeness when they are received following mortgage loan closings.  In the normal course of business, once a mortgage loan binder is complete and in order, it would be submitted by MTMC to the United States Department of Housing and Urban Development ("HUD") to be insured or "endorsed" by the Government.  Once HUD approves a loan for endorsement, MTMC may obtain reimbursement from HUD should a borrower default and MTMC suffers a loss or is required to pursue foreclosure.

Plaintiff alleges that the mortgage loan binders often included missing, incomplete, or unsigned documents.  HUD required loan binders to be submitted within sixty days of closing to avoid a more burdensome administrative process for seeking HUD insurance. Due to the sixty-day requirement, and the increased volume of loan applications in 2002 flowing from historically low interest rates,

---

[1] Unless otherwise identified, the facts contained herein are undisputed and taken from the Amended Complaint and the parties' Undisputed Statements of Material Facts.

Plaintiff alleges that she and others in the Post Closing
Department forged signatures on certain documents found in the
loan binders prior to their submission to HUD.  Plaintiff alleges
that her supervisor, Camille Bettcker, and a co-worker, Suzanne
Palmer,[2] also engaged in forging signatures.  Palmer, and another
MTMC employee, Christine Meier, have subsequently admitted that
they falsified signatures on certain documents in the loan binders.

The Plaintiff's expert forensic handwriting analyst, John
Hargett, has determined that a total of fifty-three loan binders
submitted to HUD contain "non-genuine" signatures.[3]  MTMC contends
that many of these signatures were on documents that were not
considered critical under HUD guidelines and could not have had an
impact on HUD's decision to insure those loans.  There is
conflicting evidence in the record regarding what impact these
"non-genuine" signatures on "non-critical" documents in the loan
binder would have had on HUD's decision to endorse the loan.

When submitting an application for insurance, HUD requires a
lender to certify to the best of its knowledge that all required
documents are in the loan binder and that they have all been
properly prepared.  The parties disagree about whether HUD could

---

[2] Suzanne Palmer is no longer employed by MTMC.

[3] However, Plaintiff no longer claims damages for two of these
fifty-three, namely the Sagastume and Cromartie loans.  Pl.'s Opp'n
to Supp. Mot. for Summ. J. at 24.

choose to deny an application for insurance if it knew that this certification was false.

**B.    Procedural History**

Plaintiff filed her Amended Complaint on May 14, 2004.[4]   Count I of the Amended Complaint alleges violations of the False Claims Act ("FCA") in that (1) MTMC knowingly presented false claims for payment to the Government in violation of 31 U.S.C. § 3729(a)(1); (2) MTMC knowingly made or used false records or statements so the Government would pay false claims in violation of 31 U.S.C. § 3729(a)(2); and (3) MTMC engaged in a conspiracy to defraud the Government by having false claims paid in violation of 31 U.S.C. § 3729(a)(3).   Count II seeks a declaratory judgment that MTMC's alleged forgery of documents violated 31 U.S.C. § 3729(a)(2). Count III seeks appropriate injunctive relief.

On August 22, 2005, Plaintiff filed a Motion to Compel the production of documents and other information regarding loan binders that MTMC had submitted to HUD, but that had not been produced in discovery.   [Dkt. No. 37].   Magistrate Judge John M. Facciola granted the Motion to Compel in part on March 31, 2006. United States ex rel. Fago v. M & T Mortgage Corp., 235 F.R.D. 11 (D.D.C. 2006).   On July 31, 2006, the Court ordered additional discovery about the new loan binders that were subject to Magistrate Judge Facciola's Order.   [Dkt. No. 71].   Plaintiff's

─────────────

[4] The United States chose not to intervene in this case.

expert John Hargett had initially identified fifteen loan binders that contained allegedly "non-genuine" signatures.  After MTMC produced these additional loan binders in compliance with Magistrate Judge Facciola's Order, Mr. Hargett identified an additional thirty-eight loan files containing documents with "non-genuine" signatures.  Thus, the number of loan files Plaintiff was alleging to contain "non-genuine" signatures totaled fifty-three.

On December 30, 2005, MTMC filed its Motion for Summary Judgment [Dkt. No. 51] regarding the initial fifteen loan files that Mr. Hargett believed to contain "non-genuine" signatures.  On March 2, 2006, Plaintiff filed a Motion to Strike [Dkt. No. 56] four declarations submitted by MTMC with its Reply in support of its Motion for Summary Judgment.  Plaintiff argued that three of the declarations were written by witnesses who had not been disclosed by MTMC as required by Fed. R. Civ. P. (26)(a)(1).  She also argued that a declaration submitted by Gerald Richards, MTMC's handwriting expert, expressed opinions he had formed after the close of discovery and the submission of Fed. R. Civ. P. 26 statements.

On April 11, 2006, the Court granted in part and denied in part Plaintiff's Motion to Strike, and struck the four declarations submitted by MTMC pursuant to Fed. R. Civ. P. 26 and 37.  United States ex rel. Fago v. M & T Mortgage Corp., 2006 WL 949899 (D.D.C. Apr. 11, 2006).

That same day, MTMC filed its Supplemental Motion for Summary Judgment [Dkt. No. 104] regarding the thirty-eight newly identified loan files.  On May 2, 2007, Plaintiff filed a Motion to Strike [Dkt. No. 107] declarations and interrogatory answers submitted by MTMC in support of its Supplemental Motion for Summary Judgment.

## II.  STANDARD OF REVIEW

Summary judgment will be granted when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits or declarations, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c).  A fact is "material" if it might affect the outcome of the action under the governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Once the moving party makes its initial showing, however, the nonmoving party must demonstrate "specific facts showing that there is a genuine issue for trial."  Celotex, 477 U.S. at 324. Accordingly, the nonmoving party must provide evidence that would permit a reasonable jury to find in his or her favor.  Liberty Lobby, 477 U.S. at 255-56.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Liberty Lobby, 477 U.S. at 249-50 (citations omitted).

In reviewing the evidence, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000).

## III. ANALYSIS

### A.   Plaintiff's Motion to Strike

As an initial matter, the Court turns to Plaintiff's Motion to Strike declarations and supplemental interrogatory responses that MTMC relies on in support of its Supplemental Motion for Summary Judgment.  Plaintiff raises a number of arguments as to why these materials should be struck.

#### 1.   Mayhill, Daly, and Gerace Declarations

First, Plaintiff argues that the declarations of fact witnesses Sheri Mayhill, Jan Daly, and Louis Gerace should be struck.  The three declarations are from title company records custodians and attach documents purportedly showing that loan documents containing allegedly non-genuine signatures had not been altered after they had been sent by the title companies to MTMC. Plaintiff argues that, despite extensive discovery in this case, the three witnesses were never identified by MTMC pursuant to Fed. R. Civ. P. 26(a)(1).  Therefore, Plaintiff was not afforded an opportunity to depose these witnesses.

MTMC responds that there was no obligation to disclose information pursuant to Rule 26(a)(1) in this case.  MTMC also

7

argues that Mayhill, Daly, and Gerace are rebuttal witnesses to Plaintiff's allegations that certain loan documents included forged signatures and that there is no obligation to disclose the identity of rebuttal witnesses. MTMC also argues that it produced to Plaintiff the documents that underlie the Mayhill, Daly, and Gerace declarations before discovery closed.

MTMC's contention that there was no obligation to disclose witnesses in this case pursuant to Rule 26(a)(1) is absolutely and totally without foundation. The Court's March 14, 2005 Amended Scheduling Order required the disclosure of all Rule 26(a) information no later than April 29, 2005. [Dkt. No. 28]. The Court can only wonder whether MTMC intentionally and purposefully misrepresented that there was no Rule 26(a) disclosure obligation in this case. This suspicion is intensified given the Court's April 11, 2006 Order, which also clearly ruled that Rule 26(a) disclosures were required in this case, and that MTMC had failed to properly make such disclosures. United States ex rel. Fago, 2006 WL 949899, at *1.

As this Court noted, "Rule 26(a)(1) requires disclosure of any individuals 'likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment.'" Id. (quoting Fed. R. Civ. P. 26(a)(1)). Litigants are under a continuing duty to supplement or correct their Rule 26(a)(1) disclosures. Fed. R. Civ. P. 26(e). Moreover,

the Court noted in its Memorandum Opinion granting Plaintiff's
first Motion to Strike that there was no "rebuttal" exception to
the Rule. <u>United States ex rel. Fago</u>, 2006 WL 949899, at *1, n.1.

"A party that without substantial justification fails to
disclose information required by Rule 26(a) or 26(e)(1)...is not,
unless such failure is harmless, permitted to use as evidence at a
trial, at a hearing, or on a motion any witness or information not
so disclosed."  Fed. R. Civ. P. 37(c)(1).  MTMC's failure to
disclose the identity of these witnesses is not harmless.  Whether
MTMC forged signatures on documents in the loan binders is a
central issue in this case and Plaintiff has been prejudiced
because she has not been afforded an opportunity to depose or
otherwise challenge the declarations of these witnesses.  Moreover,
once MTMC learned of the existence of these additional witnesses,
it had an affirmative and continuing obligation to supplement its
Rule 26(a) disclosures.  Fed. R. Civ. P. 26(e)(1).  Nevertheless,
MTMC did not do so.  The Mayhill, Daly, and Gerace declarations are
therefore **struck**.[5]

## 2.   Richards Declaration

In support of its Reply for its Motion for Summary Judgment,
MTMC submitted a declaration by its handwriting expert, Gerald
Richards, stating that Mr. Richards had compared the allegedly non-

---

[5] Because Rule 37(c)(1) requires these declarations to be
struck, the Court does not address Plaintiff's argument that the
declarations do not comply with Fed. R. Civ. P. 56(e).

genuine signatures in the original fifteen loan files with the known signatures of five MTMC employees, namely the Plaintiff, Camille Bettcker, Christine Meier, Suzanne Palmer, and Andrea Brandt.   Mr. Richards opined that, in his analysis, nothing suggested that the MTMC employees were responsible for the allegedly non-genuine signatures.   MTMC submitted the very same declaration again in support of its Supplemental Motion for Summary Judgment.

The Court previously struck the declaration, on April 11, 2006, because it contained a previously undisclosed expert opinion. <u>United States ex rel. Fago</u>, 2006 WL 949899, at *1.   MTMC filed a Motion for Reconsideration [Dkt. No. 64], which was denied in a Minute Order on December 19, 2006.

Plaintiff argues that the Court previously struck the declaration as a sanction for MTMC's earlier discovery abuses, and that the Court had rejected the argument MTMC made in its Motion for Reconsideration of the Court's April 11, 2006 Order that the initial rationale for striking Richards' declaration no longer applied.

Plaintiff also claims that she was entitled to rely on the language of the Court's April 11, 2006 Order.   In a declaration submitted in support of her Motion to Strike, Cyril Smith, counsel for Plaintiff declared:

> When I took Mr. Richards' deposition on the subject of
> the 38 loans in February 2007, I assumed that the Order

> remained valid and continued to bind the parties – and
> that his declaration remained stricken as a sanction for
> M&T's earlier failure to disclose Mr. Richards' opinion.
> As a result, I did not examine Mr. Richards on the
> subjects addressed in his declaration.

Declaration of Cyril V. Smith, ¶¶ 6-7.

MTMC argues that the Richards Declaration should now be allowed because the initial rationale for striking it no longer applies.  It argues that the declaration was initially struck because discovery had closed and there was no opportunity for Plaintiff to depose Mr. Richards regarding his newly expressed expert opinions.  Since that time, however, discovery has reopened and Plaintiff has been afforded an opportunity to re-depose Mr. Richards.  At that deposition, Plaintiff chose not to question Mr. Richards regarding the opinions he expressed in his declaration.

Plaintiff is correct that the Richards Declaration was initially struck as a discovery sanction because of its untimeliness.  United States ex rel. Fago, 2006 WL 949899, at *1.

It is also true that by denying the Motion for Reconsideration, the Court rejected MTMC's argument that the re-opening of discovery gave Plaintiff an opportunity to re-depose Mr. Richards and therefore the rationale for striking the Richards Declaration no longer applied.

The Motion for Reconsideration was denied because MTMC's argument is fundamentally flawed.  Discovery was not reopened for all purposes.  Instead, it was reopened for the limited purpose of

11

allowing discovery relating to the additional thirty-eight loan binders subject to Magistrate Judge Facciola's March 31, 2006 Order, not the original fifteen. <u>See</u> July 31, 2006 Order [Dkt. No. 71]. The Richards Declaration was submitted prior to the March 31, 2006 Order and does not relate to the additional thirty-eight loan binders subject to Magistrate Judge Facciola's Order. Therefore, Plaintiff was never entitled to conduct additional discovery relating to this declaration.

Finally, Plaintiff was entitled to rely on the Court's April 11, 2006 Order. It would be fundamentally unfair to penalize Plaintiff for not questioning Mr. Richards about this declaration when he was re-deposed, because she relied in good faith on the Court's earlier rulings. The Richards declaration is, and remains, **struck**.

### 3. MTMC's Supplemental Interrogatory Response

Plaintiff also moves to strike a supplemental interrogatory response by MTMC that was served on Plaintiff after discovery closed and was filed with MTMC's Supplemental Motion for Summary Judgment. The supplemental response identified those MTMC employees who reviewed the thirty-eight newly identified loans.

MTMC argues that the relevant interrogatory does not request information regarding the newly identified loans. Moreover, Magistrate Judge Facciola agreed when he denied Plaintiff's earlier Motion to Compel a supplemental response to the interrogatory,

holding that the requested additional information was not responsive to any of Plaintiff's discovery requests. United States ex rel. Fago v. M & T Mortgage Corp., 238 F.R.D. 3, 12-14 (D.D.C. 2006).

Discovery closed in this case on March 9, 2007, but MTMC did not serve its supplemental interrogatory response until April 11, 2007, when it filed its Supplemental Motion for Summary Judgment. Because the supplemental interrogatory response was submitted after the close of discovery, MTMC may not rely on that response in support of its Supplemental Motion for Summary Judgment. Although MTMC was not obligated by Magistrate Judge Facciola's discovery Order to respond to Plaintiff's interrogatory, this does not mean that it can then sandbag the Plaintiff by responding to the interrogatory only after discovery had closed and then attempt to rely on this information in support of its Supplemental Motion for Summary Judgment. Rule 37(c)(1) is clear--a party may not use evidence from a witness, whose identity it was required to disclose under Rule 26(a)(1) and 26(e)(1), but failed to do so, in support of a motion for summary judgment. Consequently, MTMC's supplemental response to the interrogatory is **struck**.

### B.   MTMC's Motion for Summary Judgment

MTMC advances a number of arguments in support of its Motion for Summary Judgment [Dkt. No. 51]. It argues that Plaintiff has failed to state a claim; that Plaintiff cannot prove that any

alleged false statements to HUD were material; that Plaintiff cannot establish a causal link between the alleged false statements and the Government's losses; that certifications MTMC made to HUD were not knowingly false; that the Government sustained no damages as a result of MTMC's actions; that the imposition of treble damages under the FCA would be unconstitutionally excessive; and that MTMC cannot be vicariously liable for punitive damages.  Each of these arguments is addressed in turn.[6]

### 1. Plaintiff Has Stated a Claim Under 31 U.S.C. §§ 3729(a)(1) and (a)(2)

MTMC argues that Plaintiff has failed to state a claim under 31 U.S.C. § 3729(a)(1) because she did not allege that MTMC's <u>actual claims</u> for reimbursement (as opposed to the applications to HUD for insurance on the loans) were false or fraudulent.  Section 3729(a)(1) provides for civil liability for "[a]ny person who--knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1).

For the same reasons, MTMC argues that Plaintiff's 31 U.S.C. § 3729(a)(2) claim fails.  That section provides liability for "[a]ny person who--knowingly makes, uses, or causes to be made or

---

[6]  MTMC also raised certain arguments regarding the Thomas, Duchon, Miller, Wareham, and Sage loans.  Those arguments are addressed below in conjunction with similar arguments raised in MTMC's Supplemental Motion for Summary Judgment.

used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2).

"[A] lending institution's application for credit insurance under [an] FHA program is not a 'claim' as that term is used in the False Claims Act." United States v. McNinch, 356 U.S. 595, 598 (1958). "It is generally accepted that the false application for a guaranteed loan...establishes only an 'inchoate' violation...that does not ripen into a claim actionable under the statute until a later event of legal consequence between the lender and the Government. See, e.g., United States v. Ekelman & Assoc., Inc., 532 F.2d 545, 552 (6th Cir. 1976) (false application ripened into claim when lender sought guarantee payment from Government); United States v. Ettrick Wood Products, Inc., 683 F. Supp. 1262, 1263-64 (W.D. Wisc. 1988) (false application ripened into claim either on date lender's demand for payment was made on government or date on which funds were disbursed)." United States v. Van Oosterhout, 96 F.3d 1491, 1494 (D.C. Cir. 1996). Since, "an actual payment to the lender qualifies as the event that effectuates the 'claim'" under the Act, the claim itself ripens the moment the Government becomes liable to the lender. Id.

All fifty-one loans for which Plaintiff seeks damages in this case defaulted.[7]   Although the allegedly false or fraudulent

---

[7] As noted above, Plaintiff no longer seeks damages for the Sagastume and Cromartie loans.

applications to HUD for these loans are not sufficient, standing alone, to state a claim under the Act, Plaintiff's "inchoate" claims ripened into "actual" ones when MTMC sought payment from HUD because the fifty-one loans in question defaulted. Therefore, Plaintiff has stated a claim under 31 U.S.C. § 3729(a)(1) and § 3729(a)(2).

> **2.   MTMC is Entitled to Summary Judgment on Plaintiff's Conspiracy Claim Under 31 U.S.C. § 3729(a)(3)**

The Amended Complaint alleges that MTMC engaged in a conspiracy to defraud the Government by having false or fraudulent claims paid in violation of 31 U.S.C. § 3729(a)(3). Am. Compl. ¶ 35.[8] MTMC argues that the intra-corporate conspiracy doctrine bars Plaintiff's conspiracy claim.

Under that doctrine, "a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." Brown v. Sim, 2005 WL 3276190, at *3 (D.D.C. Sept. 30, 2005) (quoting McAndrew v. Lockheed Martin Corp., 206 F.3d 1031, 1036-37 (11th Cir. 2000)). The alleged members of the conspiracy are MTMC and its employees. Because MTMC cannot, as a matter of law, conspire with its employees, MTMC is entitled to judgment as a matter of law in its favor on Plaintiff's conspiracy claim.

---

[8] Although Plaintiff claims not to have asserted a conspiracy claim under 31 U.S.C. § 3729(a)(3), Pl.'s Opp'n to Mot. for Summ. J. at 17, n.13, the Amended Complaint clearly states otherwise.

3.   **There Are Disputed Issues of Material Fact
     Regarding the Materiality of MTMC's Alleged False
     Statements**

To state a claim under the FCA, Plaintiff must prove that the alleged false or fraudulent statements were material.   United States v. TDC Mgmt. Corp., 24 F.3d 292, 298 (D.C. Cir. 1994); Tyger Constr. Co. v. United States, 28 Fed. Cl. 35, 55 (1993).   A false statement is material if it "has a natural tendency to influence agency action or is capable of influencing agency action."   United States ex rel. Berge v. Bd. of Trs. of the Univ. of Alabama, 104 F.3d 1453, 1460 (4th Cir. 1997);[9] see also Hays v. Hoffman, 325 F.3d 982, 992 (8th Cir. 2003) ("false claims were material if they were capable of influencing the government's payment decision") (internal quotation marks omitted).

MTMC argues that HUD guidelines spell out what information HUD considers material in its decision to insure a loan.   Specifically, MTMC claims that Appendix 17 to the Direct Endorsement Program Handbook 4000.4 sets out the eleven specific documents in a loan binder that HUD will consider in deciding to insure a loan.   MTMC maintains that the list is exclusive, and HUD will not consider other documents.   Because a number of the allegedly non-genuine

---

[9] In the Fourth Circuit, materiality is a mixed question of law and fact to be determined by the court.   Id.   Whether questions of materiality are to be determined by the court or the jury is an open question in this Circuit.   Because the Court finds disputed questions of material fact on the question of the materiality of MTMC's alleged false statements, the Court need not resolve this issue at this juncture.

signatures in the loan binders were on documents that were not listed on Appendix 17, MTMC argues that such forged signatures could not be material to HUD's decision to insure.

The applicable governing regulation authorizes HUD "to determine if there is _any information_ indicating that any certification or required document is false, misleading, or constitutes fraud or misrepresentation on the part of any party..." 24 C.F.R. § 203.255(c) (emphasis added). Contrary to MTMC's argument, HUD is specifically authorized under the regulation to consider "any information" in determining if a loan application is misleading, false, or fraudulent, and to deny it on that basis. See id. The regulation does not preclude HUD from reviewing any particular documents to determine if the loan application is fraudulent.   See id.

HUD guidelines are consistent with this regulation.   HUD Handbook 4000.4 § 4-7 states that "[t]he pre-endorsement review is confined to those items specified in this paragraph.  No further review is required or authorized prior to endorsement _unless_ HUD has reason to suspect fraud in the origination process." (emphasis added).  The guideline permits HUD to review additional information beyond the documents specified if HUD has reason to suspect that fraud has occurred.   This is entirely consistent with the regulation's authorization to HUD to review "any information" to

determine if a loan application is false or fraudulent.   24 C.F.R. § 203.255(c).

Finally, it must be noted that Appendix 17, on which MTMC relies so heavily, is merely a "checklist" to help those seeking endorsement submit all the required documentation.  It is not an official agency regulation promulgated pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 551 et seq., and is not printed in the Code of Federal Regulations.  Most significantly, there is no suggestion anywhere in Appendix 17 that the list of required documents is exclusive or that HUD is precluded from considering other information as provided in 24 C.F.R. § 203.255(c).   MTMC is simply wrong in arguing that HUD is not authorized to consider documents not listed in Appendix 17.

In response to MTMC's argument, Plaintiff points to evidence that she contends creates a genuine issue of material fact regarding whether HUD is limited to only reviewing those documents in Appendix 17.   First, MTMC's own HUD expert, Morris Carter, testified that HUD sometimes "looked at more documents than what are required under the regulations and its own handbook guidance" in conducting its pre-endorsement review of loans.  Deposition of Morris E. Carter, Aug. 2, 2005 (Carter Dep.) at 35.   In fact, Mr. Carter testified that two documents he had previously identified as "non-critical" could be "critical" to HUD's decision to endorse a

loan, based upon the particular facts of each loan, even though neither document was listed in Appendix 17.  <u>Id.</u> at 155-56.

Indeed, Mr. Carter's testimony undermines MTMC's argument. MTMC argues that documents containing "non-genuine" signatures were not material to HUD's decision to endorse twelve of the fifteen loans that are the subject of its initial Motion for Summary Judgment.  At his deposition, however, Mr. Carter testified that seven of these loans involve signatures on documents that, in fact, would be material to HUD's decision to endorse the loan.  Carter Dep. at 155-65.  Of the remaining five loans, he could not opine that the relevant loan documents containing non-genuine signatures were not critical because he had not examined the "circumstances" or "context" of a particular loan.  <u>See, e.g.,</u> Carter Dep. at 158 (Cavert loan).  Moreover, MTMC did not support its argument in its Supplemental Motion for Summary Judgment that the "non-genuine" signatures in twenty-nine of the latter group of thirty-eight loans were not material with any expert testimony, or indeed, any evidence at all.

The evidence also indicates that HUD could choose to seek indemnification for a loan, even after it had been endorsed.  Mr. Carter testified that HUD could seek indemnification for an approved loan if it later determined that loan documents contained forged signatures.  <u>Id.</u> at 47.  Alan Kappeler, MTMC's other HUD expert, testified that HUD could also seek indemnification if

documents were missing from the loan binders.  Deposition of Alan
J. Kappeler, Aug. 3, 2005 (Kappeler Dep.) at 22.

Plaintiff also points to the certification MTMC was required
to submit with each loan binder certifying, to the best of MTMC's
knowledge, that "[t]he copies of the credit and security
instruments which are submitted herewith are true and exact copies
as executed and filed for [the] record."  Form HUD-92900-A at 4.
The certifications were allegedly false because the loan binder
contained forged documents.[10]  Mr. Kappeler testified that if HUD
was certain a certification was false, HUD "certainly could refuse
to endorse."  Kappeler Dep. at 68.

Because a genuine issue of material fact remains regarding
whether the allegedly forged signatures and false certifications
were "capable of influencing" or had a "natural tendency to
influence," United States ex rel. Berge, 104 F.3d at 1460, HUD's
decision to endorse the loans or later seek indemnification,
summary judgment is inappropriate on the issue of materiality.

_____

[10] MTMC also argues that there is no evidence that the
certifications were false.  For the reasons set forth below, see
Section III.B.5., the Court concludes that there is a genuine
dispute of material facts that precludes summary judgment on that
issue as well.

### 4.   Plaintiff Has Failed to Raise a Triable Issue as to Causation for her Claims for Actual Damages

MTMC argues that it is entitled to summary judgment because Plaintiff cannot prove a causal link between the allegedly forged signatures in the loan binders and the Government's damages.

As an initial matter, it is important to note that the FCA provides for two types of liability. <u>United States ex rel. Schwedt v. Planning Research Corp.</u>, 59 F.3d 196, 199 (D.C. Cir. 1995). "First, the submitter of a 'false claim' or 'statement' is liable for a civil penalty, regardless of whether the submission of the claim actually causes the government any damages." <u>Id.</u>  Thus, Plaintiff need not prove that the alleged false statements caused the Government any actual damages in order to recover statutory civil penalties under the FCA.

The second form of liability is for damages <u>actually</u> caused the Government because of the submission of the false claim.  <u>Id.</u> To recover for these damages, Plaintiff must prove causation-- specifically that the Defendant caused the Government to pay claims "because of" the alleged false statements.  <u>Id.</u> at 200; 31 U.S.C. § 3729(a).  Therefore, MTMC's causation argument is limited to Plaintiff's claim for actual damages to the Government, and does not impact Plaintiff's claim for civil statutory penalties.

At first blush, this issue does not appear appropriate for summary judgment because so many facts relating to causation are strongly disputed and because causation is usually a question for

the jury.  Upon closer analysis though, those facts in dispute between the parties are not material when considered through the lense of the controlling causation standard in this Circuit.

This Circuit has adopted the proximate causation standard for actual damages in FCA cases which has been adopted by the Third and Fifth Circuits.  United States ex rel. Schwedt, 59 F.3d at 200 (citing United States v. Miller, 645 F.2d 473, 475-76 (5th Cir. 1981) and United States v. Hibbs, 568 F.2d 347, 351 (3rd Cir. 1977)); see also United States v. Spicer, 57 F.3d 1152, 1157 (D.C. Cir. 1995); but see United States v. First Nat'l Bank of Cicero, 957 F.2d 1362, 1374 (7th Cir. 1992) (adopting less "unduly restrictive" "but for" causation standard in FCA cases).  Under this standard "the submitter of a false claim should be liable only for those damages that arise because of the falsity of the claim, i.e., only for those damages that would not have come about if the defendant's misrepresentations had been true."  United States ex rel. Schwedt, 59 F.3d at 200 (emphasis in original).

In Schwedt, the Defendant allegedly submitted false progress reports about the status and success of a software system it was developing for the Department of Labor.  The plaintiff argued that these false progress reports were the "but for" cause of the government's losses because, had the progress report not been submitted, the government would never have paid for and accepted the software system.  Id. at 200.

23

The Court of Appeals rejected this broader theory of causation. Instead, it held that in order to satisfy the more restrictive proximate cause standard adopted in <u>Miller</u> and <u>Hibbs</u>, the government had to prove that it "relied on the progress reports' representations that the project was nearing successful completion in deciding to pay for the individual components." <u>Id</u>. In rejecting <u>Schwedt</u>'s arguments, the court noted that "it is immaterial that the government found the <u>individual</u> components to be contractually compliant or even that they were, in fact, compliant." <u>Id</u>. (emphasis in original). What the Government was relying on was "the progress reports' [specific] representations that the project was nearing successful completion in deciding to pay for the individual components [of the software system]." <u>Id</u>. Consequently, the court concluded that if the government could establish that it relied--not just on the defendant's representations that individual components were contractually compliant, but rather that the whole software package was imminently available, it could meet the more restrictive standard that the Court of Appeals was adopting. For this reason, so long as the government could prove its allegations, it could show that its damages arose "because of the <u>falsity</u> of the claim" that the software package as a whole was progressing appropriately. <u>Id</u>. (emphasis in original).

The facts of <u>Spicer</u> are even more analogous to this case.  In <u>Spicer</u>, a bankruptcy case, the debtor had previously made false statements to obtain HUD-insured mortgages, entered into a settlement agreement with the government for violation of the FCA, and was seeking to have the obligation of the settlement agreement discharged under the bankruptcy laws.  57 F.3d at 1154.  Spicer conceded that he misrepresented certain facts on applications to HUD for mortgages and that the applications were the "but for" cause of HUD's losses when some of the home owners later defaulted. <u>Id</u>. at 1157.  Nevertheless, he argued that the proximate cause of default by the homeowners was due to "a variety of factors, such as job loss or other personal financial reversals, all beyond Spicer's control."  <u>Id</u>.

The Court of Appeals disagreed and determined that Spicer's misrepresentations were the proximate cause of HUD's losses.  It found, that the findings of the bankruptcy court were "consistent with proximate causation," and that there was "<u>some</u> causal nexus between Spicer's misrepresentations and the government's losses." <u>Id.</u> at 1155 (emphasis in original).  For that reason, it concluded that the plaintiff had met the proximate cause standard.  In explaining its reasoning, the Court of Appeals noted that "Spicer's misrepresentations were material to HUD's determination that the mortgage applicants met the financial requirements to qualify for FHA-insured mortgages and had a sufficient personal financial stake

25

in the properties to have the proper incentive to avoid default. The misrepresentations were thus more than a 'but-for' cause; they proximately caused HUD's losses when the buyers to whom HUD improvidently granted FHA-insured mortgages on the basis of Spicer's misrepresentations of their financial qualifications defaulted. The defaults were thus a foreseeable consequence of Spicer's conduct." Id. at 1159.[11]

Both Schwedt and Spicer relied on Hibbs, decided by the Fifth Circuit. In that case, the false certifications made to HUD concerned the property's "heat, plumbing and electrical systems." 568 F.2d at 349. Those misrepresentations were not the proximate cause of HUD's losses because neither the default by the mortgagors nor the unexpected decrease in property values caused by the entry of a lead paint injunction, were "caused by or related to the false certifications" about the heating, plumbing, and electrical systems." Id. at 351.

To summarize, the law in our Circuit requires Plaintiff to show that the specific misrepresentations made to HUD in this case were the direct and proximate cause of HUD's losses and not merely the "but for" cause of those losses. Id. at 1159; Schwedt, 59 F.3d

---

[11]    The Court of Appeals acknowledged that other factors also caused the defaults, but emphasized that "as long as Spicer's misrepresentations were a material and proximate cause, they need not have been the sole factor causing HUD's losses. . . . See also In re Gerlach, 897 F.2d at 1052 ('a debt is "obtained by" fraud if the fraud is a substantial factor in the creditor's decision')." Id.

at 200. Thus, if the subject matter of the alleged misrepresentation is unrelated to the ultimate reason for the borrower's default (and the claim against HUD that flows from that default) Plaintiff cannot recover any damages on behalf of the Government.

Plaintiff argues that there is a genuine issue of material fact regarding causation because had MTMC told HUD the truth--_i.e._ that not all documents in the loan binders contained genuine signatures--HUD would have rejected the loan applications and returned them to MTMC. For example, Christine Meier, an MTMC employee, testified that if any one of the forty documents that was required to be in the loan binder was missing, HUD would reject the entire application. Deposition of Christine Meier, Sept. 27, 2005 ("Meier Dep.") at 29-30. Suzanne Palmer also testified that HUD would reject the application if documents were missing signatures. Deposition of Suzanne Palmer, May 25, 2005 ("Palmer Dep.") at 150.

This argument, however, mistakenly construes <u>Schwedt</u> and <u>Spicer</u> to apply the less restrictive "but for" test for causation to False Claims Act cases. As demonstrated above, the Plaintiff must go beyond a "but for" showing and demonstrate that the false statements in this case were the proximate cause of the Government's actual damages.

Plaintiff has failed to demonstrate any evidence showing that the presence of the non-genuine signatures on various documents in

the loan binders was in any way related to the actual reason that various borrowers defaulted.  For instance, Plaintiff has produced evidence showing that the Wood Destroying Insect Infestation Report for the Diaz loan contained a non-genuine signature.  But there is no evidence that the inclusion of a non-genuine signature on this document was the proximate cause of the borrower's default and the resulting claim against HUD.  If Plaintiff had come forward with evidence, for example, showing that the borrower had defaulted because the property value had been adversely impacted by a termite infestation, she may have been able to demonstrate a triable issue. Simply stated, Plaintiff has not produced evidence that the borrower defaulted on the Diaz loan because a signature on the termite report had been forged.  The same is true for each of the loans for which Plaintiff seeks actual damages on behalf of the Government.  In short, Plaintiff must be able to show that damages arose "because of the <u>falsity</u> of the claim," and that those damages "would not have come about if the defendant's misrepresentations had been true," <u>Schwedt</u>, 59 F.3d at 200 (emphasis in original).

In the absence of any such evidence showing a genuine issue of material fact relating to Plaintiff's burden to prove proximate causation, MTMC is entitled to summary judgment as to Plaintiff's claims for actual damages to the Government flowing from the submission to HUD of the fifty-one loan binders in question. Plaintiff may nevertheless continue to seek statutory civil

penalties under the FCA, which do not require a showing of causation.

### 5. There Are Disputed Issues of Material Fact Regarding Whether MTMC Knowingly Made False Certifications to HUD

MTMC argues that Plaintiff cannot prove that MTMC knowingly submitted false certifications to HUD.

MTMC stated that its certifications were made "to the best of its knowledge." Form HUD-92900-A at 4. The certification also states that

> I, the undersigned, as authorized representative of the
> mortgagee at this time of closing of this mortgage loan,
> certify that I have personally reviewed the mortgage loan
> documents, closing statements, application for insurance
> endorsement, and all accompanying documents. I hereby
> make all certifications required for this mortgage as set
> forth in HUD Handbook 4000.4.

Id.

Plaintiff must prove that MTMC "knowingly presented a false or fraudulent claim" to the Government. United States ex rel. Ervin & Assocs., Inc. v. Hamilton Sec. Group, Inc., 370 F. Supp. 2d 18, 40 (D.D.C. 2005). A person acts "knowingly" under the FCA if he or she

> (1) has actual knowledge of the information;
> (2) acts in deliberate ignorance of the truth or falsity
>     of the information; or
> (3) acts in reckless disregard of the truth or falsity of
>     the information

31 U.S.C. § 3729(b).

MTMC argues that a certification "to the best of one's knowledge" cannot be said to be either true or false and therefore cannot form the basis of an FCA claim.  Mot. for Summ. J. at 26. Relying upon United States v. Ekelman & Assocs., Inc., 532 F.2d 545, 549 (6th Cir. 1976), it contends that unless the actual signer of the certification knew that documents in the loan binder were not properly executed, the certification cannot be a false one. MTMC reads far too much into Ekelman.  Both its holding and its facts distinguish it from this case.

First, the precise holding of the Sixth Circuit was that a lender could not be "liable under the False Claims Act for failing to verify information, subsequently determined to be false, which it certified was 'true to the best of [its] knowledge and belief.'" Id.  There is no question raised in this case about any failure or obligation to verify facts.

Second, in Ekelman, there was no dispute that the lender unknowingly passed information it received from the other defendants to the government, and that such information later turned out to be false.  Id. at 547-48.  In short, the defendant lender had no knowledge of the falsity of the information he gave the government and merely served as a conduit between other parties and the government.  Id.  Finally, contrary to MTMC's representation, Ekelman does not stand for the blanket proposition

that certifications "to the best of one's knowledge" cannot, as a matter of law, ever be the basis for an FCA claim.

In response, Plaintiff offers two cases which are far more analogous to the present factual scenario. In United States ex rel. Harrison v. Westinghouse Savannah River Co., 352 F.3d 908, 917 (4th Cir. 2003), the defendant argued that it lacked the requisite scienter when it certified to the government that it did not have a conflict of interest with another government contractor. The defendant complained that the district court's jury instruction "allowed the jury to piece together knowledge of more than one of its employees to find that the corporation knowingly made a false statement." Id. at 918. The Fourth Circuit rejected this argument, holding that if at least one corporate employee knew that a conflict of interest existed, a jury could find the requisite degree of scienter for liability to attach under the FCA. Id. at 919.

The Eleventh Circuit applied the same rationale in Grand Union Co. v. United States, 696 F.2d 888, 890-91 (11th Cir. 1983). In Grand Union, cashiers at a supermarket were aware that government-issued food stamps were being used to purchase non-food items. Id. at 890. The head cashier routinely certified to the government that the food stamps had not been used to purchase non-food items, although she had no personal knowledge that any of the food stamps had been used in this way. Id. Nevertheless, the court held that

31

the knowledge of the other cashiers could be imputed to the corporation and that the certification could therefore be knowingly false. Id. at 891.

In this case, Plaintiff has presented evidence that it was MTMC employees themselves who forged signatures on loan documents and that MTMC then falsely certified to HUD that all loan documents were properly executed. Based on United States ex rel. Harrison, 352 F.3d at 919 and Grand Union Co., 696 F.2d at 891, this is sufficient to raise a genuine dispute of fact regarding whether MTMC's certifications were knowingly false.

### 6.  MTMC's Challenge to FCA Treble Damages Under the Excessive Fines Clause Is Premature

MTMC argues that treble damages under the FCA are punitive in nature and therefore implicate the Excessive Fines Clause, citing Vermont Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 784-85 (2000) (holding that states are not subject to FCA liability because the punitive nature of damages under the FCA is contrary to the presumption against imposition of punitive damages against government entities).

It is correct that several Circuits have specifically applied the Excessive Fines Clause to awards of damages under the FCA. United States v. Mackby, 339 F.3d 1013, 1016 (9th Cir. 2003); Hays, 325 F.3d at 992. "[A] punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a

defendant's offense."   <u>United States v. Bajakajian</u>, 524 U.S. 321, 334 (1998).

However, "the question [of] whether a fine is constitutionally excessive calls for the application of a constitutional standard to the facts of a particular case."   <u>Id.</u> at 336, n.10.   Thus, the contours of the offense must first be established before a court can determine if the fine imposed is unconstitutionally excessive. Not surprisingly, the <u>Mackby</u> and <u>Hays</u> courts only addressed the Excessive Fines Clause issue <u>after</u> a fine had been imposed on the defendant and the contours of the offense were well established. <u>Mackby</u>, 339 F.3d at 1015-16; <u>Hays</u>, 325 F.3d at 992-94.   As Plaintiff correctly points out, there are numerous undecided questions of fact that must be determined at trial, including the appropriate amount of statutory penalties, if any, to be awarded. It is therefore premature to consider MTMC's argument that any fine against it would be unconstitutionally excessive.

### 7.   There Are Disputed Issues of Material Fact Regarding Whether MTMC Is Vicariously Liable

MTMC argues that it cannot be held vicariously liable for the acts of its employees in this case based on <u>Kolstad v. Am. Dental Ass'n</u>, 527 U.S. 526 (1999) and <u>United States v. S. Maryland Home Health Servs.</u>, 95 F. Supp. 2d 465 (D. Md. 2000).

In <u>Southern Maryland Home Health Services</u>, the court held that "an employer is <u>not</u> vicariously liable under the FCA for wrongful acts undertaken by a non-<u>managerial</u> employee unless the employer

33

had knowledge of her acts, ratified them, or was reckless in its hiring or supervision of the employee."  95 F. Supp. 2d at 468-69 (emphasis in original).  The court relied heavily on Kolstad, which held that common law restrictions on the imposition of punitive damages applied in a Title VII case where a principal has been held vicariously liable for the acts of its agent.  527 U.S. at 541-44.

Southern Maryland Home Health Services, which was never appealed, has been criticized and goes against the great weight of authority in FCA cases.  See United States ex rel. Shackelford v. Am. Mgmt., Inc., 484 F. Supp. 2d 669, 673-76 (E.D. Mich. 2007) (analyzing cases, criticizing S. Maryland Home Health Servs., and holding that "a principal is vicariously liable whenever its agents act within the scope of their employment or with apparent authority regardless of the employer's knowledge or culpability"); see also United States v. O'Connell, 890 F.2d 563, 567-69 (1st Cir. 1989) (corporation liable under FCA if agent acted with apparent authority); Grand Union Co., 696 F.2d at 891 (knowledge of employee imputed to corporation if employee acts for the benefit of the corporation and within the scope of his employment); United States v. Hangar One, Inc., 563 F.2d 1155, 1158 (5th Cir. 1977) (vicarious liability for a corporation may arise under the FCA "from the conduct of employees other than those with substantial authority and broad responsibility") (internal quotation marks omitted); United States ex. rel Bryant v. Williams Bldg. Corp., 158 F. Supp.

2d 1001, 1006-09 (D. S.D. 2001) (<u>Kolstad</u> does not apply in FCA context).

However, the Court need not resolve this disagreement or choose from the array of alternative standards applied in the cases cited above. Even under the <u>Southern Maryland Home Health Services</u> standard proferred by MTMC, there remain disputed questions of material fact and summary judgment is inappropriate.

MTMC's argument is premised on the assertion that the MTMC employees involved in the alleged forgeries were "clerical level employees without any management responsibility." Mot. for Summ. J. at 32. The evidence indicates that a genuine dispute of fact exists regarding this assertion. For example, Camille Bettcker testified at her deposition that, from 1996 on, she was both a supervisor and a manager at "M&T."[12] Deposition of Camille Bettcker, May 26, 2005 ("Bettcker Dep.") at 24-25. Summary judgment is therefore inappropriate on the issue of MTMC's vicarious liability.

### C.   MTMC's Supplemental Motion for Summary Judgment

MTMC's Supplemental Motion for Summary Judgment repeats many of the arguments made in its original Motion for Summary Judgment. In its Supplemental Motion, MTMC adds the argument that there is no evidence that any of the allegedly forged signatures were the

---

[12] It is also unclear from this testimony if Ms. Bettcker is an employee of MTMC, or its parent company, M & T Bank.

result of the actions of an MTMC employee; that Plaintiff cannot prove the Government suffered damages on the Stephen Woods loan because MTMC indemnified HUD for that loan;[13] and that MTMC was not the source of the allegedly forged signatures for the Gretchen Miller, Lisa Pursel and Amanda Wilmont loans based on declarations submitted by employees of third party title companies.[14]  Each of these arguments is addressed in turn.

> **1.    There Are Disputed Questions of Material Fact Regarding Who Was Responsible for the Allegedly Forged Signatures**

MTMC argues that there is no evidence whatsoever that links the allegedly forged signatures with any MTMC employee.  This argument is easily disposed of.

Plaintiff's handwriting expert, John Hargett, has opined that of the fifty-three loan binders that contain alleged forgeries, fifty-two involved at least one forged signature that was not made by a co-borrower or family member or other signatory listed in the loan binder.  Declaration of John Hargett, May 4, 2007 ("Hargett Decl.") ¶ 7.  Hargett opined that there was evidence of multiple non-genuine signatures in the Mineo loan binder and at least one may have come from a non-family member.  Id.  The evidence also

---

[13] MTMC also argued in its Motion for Summary Judgment that HUD has been indemnified for the Thomas, Duchon, and Miller loans. This argument is addressed below.

[14] MTMC also argued in its Motion for Summary Judgment that the Wareham and Sage loans are not actionable for similar reasons. This argument is also addressed below.

indicates that Suzanne Palmer, who has admitted to forging signatures in the past, was the last MTMC employee to handle every single loan binder. Palmer Dep. at 116-118.[15] A reasonable jury could therefore infer that Ms. Palmer forged the signatures before submitting the loan binders to HUD.

### 2. MTMC Is Not Entitled to Summary Judgment on the Woods, Duchon, Miller, and Thomas Loans

MTMC argues in its Supplemental Motion that it is not liable on the Stephen Woods loan because it has indemnified HUD for any losses it suffered. MTMC made the same argument with regard to the Duchon, Miller, and Thomas loans in its Reply in support of its Motion for Summary Judgment.

Plaintiff responds that MTMC improperly relies on inadmissible evidence in support of its arguments regarding the Duchon, Miller, and Thomas loans.[16] MTMC relies on a letter from HUD seeking indemnification, an indemnification agreement between HUD and MTMC, and a letter from MTMC's counsel to Plaintiff's counsel, stating that MTMC had agreed to indemnify the loans.

---

[15] Plaintiff also presents evidence that raises a genuine issue of material fact regarding whether MTMC later ratified the actions of its employees because it conducted a flawed investigation of the misconduct and because it kept Ms. Bettcker, Ms. Meier, and Ms. Palmer on its payroll after learning of their forging of signatures. See Pl.'s Opp'n to Mot. for Summ. J. at 38-41. A reasonable jury could find from this evidence that MTMC ratified the acts of its employees.

[16] Plaintiff concedes that MTMC's argument concerning the Woods loan is supported by admissible evidence. Pl's Opp'n to Supp. Mot. for Summ. J. at 2.

A motion for summary judgment must be supported by evidence that would be admissible at trial.  Gleklen v. Democratic Cong. Campaign Comm., 199 F.3d 1365, 1369 (D.C. Cir. 2000); Fed. R. Civ. P. 56(e).  As Plaintiff correctly states, the letter from MTMC's counsel is inadmissible hearsay and cannot be admitted at trial. Fed. R. Evid. 801, 802.  It cannot be admitted as the admission of a party-opponent, see Fed. R. Evid. 801(d)(2), because the statement is being offered by the party that made the statement. On the other hand, Plaintiff has not identified any reason why the letter from HUD seeking indemnification and the indemnification agreement itself could not be "converted into admissible evidence" at trial.  Gleklen, 199 F.3d at 1369.  These two documents may therefore be properly considered in ruling on MTMC's Motion for Summary Judgment.

Plaintiff also argues, with little discussion, that MTMC should have pled its indemnification defense as an affirmative defense in its Answer pursuant to Fed. R. Civ. P. 8(c).  Plaintiff provides no authority for its assertion that an argument challenging Plaintiff's burden to prove that the Government suffered damages is an "affirmative defense," nor has the Court found any.  This argument is therefore rejected.

Plaintiff also argues that MTMC's argument disregards the correct method for computing damages under the FCA.  The proper method, according to Plaintiff, is to calculate the Government's

38

actual damages, triple the damages pursuant to 31 U.S.C. § 3729(a), and only then subtract compensatory payments made to the Government. Defendant contends that to determine actual damages, any compensatory payments must first be subtracted from the actual damages, and the reduced figure should then be trebled. Interestingly, both sides cite to United States v. Bornstein, 423 U.S. 303 (1976), for support.

A proper reading of Bornstein fully supports Plaintiff's calculation methodology. Bornstein involved falsely branded tubes that cost the Government $40.82 per tube to replace. 423 U.S. at 313-14. However, the Government had previously received $40.72 per tube as the result of a settlement agreement with another defendant. Id. at 314. The district court and court of appeals-- consistent with MTMC's valuation methodology--found that the Government's actual damages were only $.10 per tube, the difference between the replacement cost and the payment already received. Id. This amount was then doubled. Id.[17]

The Supreme Court ruled that this method was incorrect--"the Government's damages should be doubled [now tripled under the 1986 False Claims Amendments Act] before any compensatory payments are deducted." Id.

---

[17] In 1986, Congress amended the False Claims Act to provide for treble damages. See 31 U.S.C. § 3729(a); False Claims Amendments Act of 1986, Pub. L. No. 99-562, 100 Stat. 3153.

MTMC relies heavily on a footnote in <u>Bornstein</u> which states that "[t]he Government's actual damages are equal to the difference between the market value of the tubes it received and retained and the market value that the tubes would have had if they had been of the specified quality." <u>Id.</u> at 316, n.13. Whatever the meaning of this somewhat Delphic footnote, the Court stated with great specificity:

> we hold that, in computing the double [now triple] damages authorized by the Act, the Government's actual damages are to be doubled [now tripled] before any subtractions are made for compensatory payments previously received by the Government from any source. This method of computation, which maximizes the deterrent impact of the double [now triple]-damages provision and fixes the relative rights and liabilities of the respective parties with maximum precision, best comports in our view with the language and purpose of the Act.

Id. at 316-17.

Accordingly, the fact that MTMC indemnified HUD for the Woods, Duchon, Miller, and Thomas loans does not eliminate MTMC's potential liability and summary judgment is therefore inappropriate. Furthermore, Plaintiff is still entitled to statutory penalties (if she can prove MTMC submitted false or fraudulent claims regarding these loans) regardless of whether she can prove that the Government suffered actual damages proximately caused by the Defendant. <u>United States ex rel. Schwedt</u>, 59 F.3d at 199.

### 3.   MTMC Is Not Entitled to Summary Judgment on the Miller, Pursel, Wilmont, Wareham, and Sage Loans

MTMC argues that there is no evidence that it was responsible for the forged signatures in the Miller, Pursel, and Wilmont loan binders based on the declarations of Sheri Mayhill, Jan Daly, and Louis Gerace--all employees of third party title companies who stated that MTMC could not have been the source of the allegedly forged signatures for those loans.   Because these three declarations have been struck, as discussed above, there is no evidence in the existing record to support MTMC's argument.

MTMC made a similar argument in its Reply in Support of its Motion for Summary Judgment with regard to the Wareham and Sage loans.   This argument was based on the declarations of Cindy Copeland and Marlisa Bouck, who were also employees of third party title companies and similarly stated that MTMC could not have been the source of the non-genuine signatures on these loans.   The Court has previously struck these declarations as well.   United States ex rel. Fago, 2006 WL 949899, at *1.   Therefore, MTMC is not entitled to summary judgment with regard to the Wareham and Sage loans.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [**Dkt. No. 51**] is **granted in part and denied in part** and Defendant's Supplemental Motion for Summary Judgment [**Dkt. No. 104**] is **granted in part and denied in part**.   MTMC is granted summary

41

judgment in its favor on Plaintiff's conspiracy claim and her claim for actual damages.   Plaintiff may still proceed with her claims for statutory civil penalties, a declaratory judgment and permanent injunction, and any other relief she is properly entitled to under the False Claims Act.

Additionally, Plaintiff's Motion to Strike [**Dkt. No. 107**] is **granted.**   An Order shall issue with this Memorandum Opinion.


October 2, 2007                          /s/_____
                                         Gladys Kessler
                                         United States District Judge


**Copies to: Attorneys of record via ECF**

42